# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRADLY GIBSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 21-00103-JB-N** |
| | ) | |
| **OUTOKUMPU STAINLESS STEEL USA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

On October 25, 2022, the Court held a hearing on the cross motions (partial) for summary judgment pending in this action. Plaintiff Bradley Gibson ("Plaintiff") moved for partial summary judgment on his claims under the FLSA and common law, but not as to damages. (Doc. 91 ("Plaintiff's Motion for Partial Summary Judgment"). Defendant, Outokumpu Stainless USA, LLC, ("Defendant") moved for partial summary judgment on a subset of Plaintiffs' FLSA claims and the common law claims of unjust enrichment and *quantum meruit*. (Doc. 98 ("Defendant's Partial Motion for Summary Judgment")).

The Court has reviewed the motions and supporting briefs (Docs. 91, 98 and 100), the Plaintiff's Statement of Facts in Support of Motion for Partial Summary Judgment (Doc. 92), Defendant's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. 112 ("Defendant's Response")), Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Doc. 117 ("Plaintiff's Reply")), Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment (Doc. 110 ("Plaintiff's Opposition")), Defendant's Reply in Support of its Motions for Partial Summary Judgment (Doc. 118 ("Defendant's Reply")), and the various exhibits

filed in support of the motions.  This matter is now ripe for a decision. For the reasons discussed below, the motions are granted in part and denied in part.

## I.      INTRODUCTION

Plaintiff Bradley Gibson, a former forklift operator at Defendant's steel mill in Calvert, Alabama, filed this action on March 5, 2021.  (Doc. 1).  In his amended complaint, Plaintiff seeks relief under the Fair Labor Standards Act of 1938 ("FLSA") 29 U.S.C. § 201, *et seq*. and/or the common law of Alabama for 1) failing to pay overtime correctly and timely; and 2) failing to pay for all time clocked in.  (Doc. 73).  This action is one of three actions pending before this Court concerning Defendant's timekeeping and pay practices.  Though the allegations have evolved, they remain essentially the same.  *See Hornady v. Outokumpu Stainless USA*, 2022 WL 495186, *6 (February 17, 2022) ("More specifically, Plaintiffs allege Defendant failed to pay overtime correctly, at the correct rate or amount, timely and for all time worked as the result of the violation of four separate regulations as follows . . .").  Here, again, Plaintiff claims Defendant failed to pay overtime correctly, at the correct rate or timely, in violation of FLSA 29 U.S.C. § 201 *et seq*. and a series of attendant regulations at 29 C.F.R. § 516 *et seq*.  *See also*, *e.g., Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1221 (January 23, 2009) ("With respect to each of these alleged violations, Plaintiffs' theory is that HL-A, by virtue of this conduct, has failed to pay them statutorily required overtime compensation of 1.5 times their regular hourly rate for all hours worked in excess of 40 in a workweek.").

For the purposes of keeping the record organized, Plaintiff's claims can be more succinctly set out as follows:

1) a claim that Defendant willfully violated the FLSA by adopting a rounding policy pursuant to which Plaintiff and similarly situated employees' time worked was

always rounded down in favor of the employer, in violation of 29 C.F.R. § 785.48 (the "rounding practices violation claim");

2) a claim that Defendant willfully violated the FLSA by failing to calculate wages according to a fixed, recurring 168-hour period in violation of 29 C.F.R. §§ 778.104-105 (the "workweek violation claim");

3) a claim that Defendant willfully violated the FLSA by failing to recalculate Plaintiff's regular hourly rate of pay, to include the monthly incentive bonuses, for the purposes of calculating the overtime rate, in violation of 29 U.S.C. § 207€ (the "bonus violation claim");

4) a claim that Defendant willfully violated the FLSA by failing to correctly calculate the regular rate of pay for the purposes of paying overtime (the "RROP calculation violation claim");

5) a claim that Defendant willfully violated the FLSA by failing to correctly pay overtime on the regular payment date or to timely pay overtime, in violation of 29 U.S.C. § 206(b) and 29 CFR § 778.106 (the "true up violation claim"); and

6) a claim Defendant violated the FLSA by failing to keep accurate wage records pursuant to 29 C.F.R. § 516.2 (the "record keeping violation claim").

(*See* Doc. 73).  Additionally, Plaintiff avers Defendant was "unjustly enriched at [all] the Plaintiff's expense," violating Alabama common law.  *(See Id.* at ¶65).

### A.    The Motions for Partial Summary Judgment

Plaintiff contends summary judgment as a matter of law is due to be granted on the following violations of the FLSA:  the bonus violation, the rounding practices violation, the workweek violation, the "RROP" calculation violation, and the true up violation.  (Doc. 91). Plaintiff also asserts summary judgment is due to be granted on his common law unjust enrichment claim.  *Id*.

Defendant argues it is entitled to summary judgment on the following:  1) the bonus violation; 2) the workweek violation; 3) the true up violation; and 4) Plaintiff's state law claim for unjust enrichment or *quantum meruit*.  (Doc. 98).

The motions have been thoroughly briefed by the parties and the Court conducted a hearing.

## II.     LEGAL STANDARDS

### A.     Standards of Review

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  If a party asserts "that a fact cannot be or is genuinely disputed", the party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)&(B).

The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and

making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBHSiegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Here, both sides have moved for summary judgment on the claims asserted in this action. It is well-settled that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same).  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  "'When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" *Muzzy Products, Corp. v. Sullivan Indus., Inc.*, 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338-1339 (Fed. Cir. 2001)). "Nonetheless, 'cross-motions may be probative of the absence of a factual dispute where they

reflect general agreement by the parties as to the dispositive legal theories and material facts.'" *Page*, 702 F. Supp.2d at 1345 (quoting *Murray*, 620 F. Supp.2d at 1307).

### B.   Statement of Law

Section 7(a)(1) of the FLSA requires that employers compensate their employees for hours worked in any workweek in excess of forty "at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C. § 207(a)(1).  Therefore, "[u]nder the FLSA, an employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate." *Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007); 29 U.S.C. § 207(a)(1).  "A person is employed if he or she is suffered or permitted to work." *Id.* (citing 29 U.S.C. § 203(g)).  "It is not relevant that the employer did not ask the employee to do the work.  The reason that the employee performed the work is also not relevant.  '[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.'" *Id.*  (quoting *Reich v. Dep't of Conservation and Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11)).

To prevail on his claim, Plaintiff must prove that he was "suffered or permitted to work without compensation."  *Allen*, 495 F.3d at 1314 (citing 29 U.S.C. § 201 *et seq.*).  In that regard, "[c]ourts have interpreted this to mean that a FLSA plaintiff must demonstrate that (1) he or she worked overtime without compensation and (2) the [employer] knew or should have known of the overtime work."  *Allen*, 495 F.3d at 1314-1315 (citing *Reich*, 28 F.3d at 1081-82 and 29 C.F.R. § 785.11 (interpreting the "suffer or permit to work" requirement to mean that an employer

violates the FLSA when it "knows or has reason to believe that he is continuing to work and the time is working time.")).

Although it is Plaintiff's burden to demonstrate he worked overtime without compensation, under the FLSA, "[i]t is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment." *Allen*, 495 F.3d at 1315 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "The employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and '[e]mployees seldom keep such records themselves.'" *Allen*, 495 F.3d at 1315 (quoting *Anderson*, 328 U.S. at 687).

The Eleventh Circuit, relying on *Anderson*, has explained that if an employer's records are in question "and the employee cannot offer convincing substitutes",

> [t]he solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Allen*, 495 F.3d at 1315-1316 (quoting *Anderson*, 328 U.S. at 687). "Thus, in situations where the employer's records cannot be trusted and the employee lacks documentation, the Supreme Court held 'that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Allen*, 495 F.3d at 1316 (quoting *Anderson*, 328 U.S. at 687-88 (relying on *Anderson* to reverse grant of summary judgment in favor of Defendant where plaintiffs had produced declarations produced deposition testimony about overtime worked)). "The burden then becomes the employer's, and

it must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Allen*, 495 F.3d at 1316 (quoting *Anderson*, 328 U.S. at 687-88). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Allen*, 495 F.3d at 1316 (quoting *Anderson*, 328 U.S. at 688)*.*

## III.    DISCUSSION

### A.    The Bonus Violation Claim

#### 1.    The Undisputed Facts

Both parties moved for summary judgment on the bonus violation claim.  Defendant incorporates a "production incentive bonus plan, which allows employees the opportunity to receive bonus pay" into their pay practices (hereinafter, the "Incentive Plan"). (Doc. 99-15 at 10). The facts surrounding Defendant's payment of bonuses under its Incentive Plan are not materially in dispute.  The Incentive Plan allows Defendant's employees to earn a "percentage bonus" of up to 24 percent.  In its offer letter to Plaintiff, Defendant explained its Incentive Plan as such: "Incentive Pay:  Additional compensation can be earned through incentives.  The program at OTK is based on production, quality, safety, and housekeeping targets.  The total incentives can range from 0 to 24% of your earnings for a respective time period and is paid monthly for the prior month." (Doc. 99-16 at 14).

The percentage is determined by collecting and analyzing a number of the plant's metrics (or "multiple key performance indicators") over a calendar month.  (*See* Doc. 112 citing to Doc. 99-16 ("The percentage of pay for OTK's incentive bonus is based on multiple key performance indicators for OTK as a whole.")).  At the end of each calendar month, various departments email

their metrics to Defendant's management staff, who then use those datapoints to determine

whether and how much of a percentage the incentive pay will be.  (Doc. 92 citing Doc. 86-2).  The

Standard Operating Procedure manual explained "Production and Planning will provide required

production data," the "Safety Manager" will provide the safety data score, and "Mill Directors

will determine the Housekeeping Score."  (Doc. 99-16 at 282).

From its analysis of these various metrics, tallied at the end of each calendar month,

Defendant determines which exact percentage to apply to its employees' wages to ascertain the

bonus amount.  (Doc. 86-2).  Defendant applies the determined percentage to the employees'

most recent wages rather than to the wages earned during the bonus calculation period (*i.e.* the

calendar month from which the metrics are gathered).  (Docs. 91, 92, 117, citing Doc. 86-1 and

86-2).

Using his pay records, Plaintiff demonstrated:

The summary charts which are Exs. 45 and 46, along with Scheid's testimony show
that every time a monthly production incentive bonus is paid the percentage (a)
is applied to some number of days (and earnings) from the month before the
calendar month in which the bonus was earned, and (b) is not applied to some
number of days (and earnings) from the calendar month during which the bonus
is earned. (Scheid II, Doc. 86-2, PageID.1298-1307, 1313-1315, 1318- 1324; Docs.
89-4, 89-5).

(Doc. 92).

## 2.    Regulations Applicable to Non-Discretionary Bonus Payments

"Defendant's bonus payments constitute 'renumeration' under FLSA, and, therefore,

must be included in calculating an employee's regular rate of pay."  *Hornady v. Outokumpu*

*Stainless United States ("Hornady II")*, 2022 WL 495186 at * 9 (February 17, 2022) (citing *Hornady*

*v. Outokumpu Stainless United States ("Hornady I")*, 572 F. Supp. 3d 1162, 1182-1183 (S.D. Ala.

November 18, 2021) (citing 29 C.F.R. 778.209(a)).  The FLSA defines 'regular rate of pay' to include 'all remuneration for employment paid to, or on behalf of, the employee,' excluding certain types of compensation provided in 29 U.S.C. § 207(e)." (citing *Opinion Letter Fair Labor Standards Act (FLSA)*, 2019 WL 2914103, at *1-2 (July 1, 2019)).

Once the regular rate of pay has been revised to include the bonus amount, any overtime pay must be recalculated at the revised regular rate.  *Hornady I*, 572 F. Supp. 3d at 1183 (citing 29 C.F.R. § 778.209(a)); *see also Russell v. Gov't Emps. Ins. Co.*, 2018 WL 1210763, at *3 (S.D. Cal. Mar. 8, 2018), aff'd, 787 F. App'x 953 (9th Cir. 2019) ("When an employer includes discretionary bonuses in the regular rate of pay, the bonus must be apportioned back over the workweeks of the period during which they may said to have been earned." (citing *Harris v. Best Buy Stores, L.P.*, 2016 WL 4073327, at *3 (N.D. Cal. Aug. 1, 2016) (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, (Jan. 23, 1997), 1997 WL 998000, at *1; and citing 29 C.F.R. § 778.209)).

"The regulations provide an alternative: an employer, however, is not required to retrospectively recalculate the regular rate if the employer pays a fixed percentage bonus that simultaneously pays overtime compensation due on the bonus."  *Hornady I*, 572 F. Supp. 3d at 1182-1183 (citing 29 C.F.R. § 778.210 and *Brock v. Two R Drilling Co.*, 789 F.2d 1177, 1179-81 (5th Cir. 1986)).   "From a mathematical perspective, a percentage bonus under Section 778.210 achieves the same result as recomputation. Thus, percentage bonuses are permissible not because they have some independent legal justification, but because they achieve the same ultimate result for the employee."  *Id.*  (quoting *Weninger v. Gen. Mills Operations LLC*, 344 F. Supp. 3d 1005, 1009 (E.D. Wis. 2018)).

The Court also cited to the following rules from a recent case in the Southern District of

California:

> In other words, an employer is not liable for additional overtime pay when they offer 'percentage-based bonuses.' A 'percentage-based bonus' is one in which the employer will award a bonus calculated as a percentage of an employee's total wages (regular pay plus overtime pay). If an employer grants a bonus to an employee as a percentage of total pay, the employer increased both the regular rate of pay and the bonus pay by the same percentage. Under a 'percentage-based bonus,' there is no need for an employer to recalculate the regular rate on which overtime pay must be based, because the employer has already accounted for an increase in overtime pay.

*Hornady II* at *10 *(citing Barragan v. Home Depot U.S.A., Inc.*, 2021 WL 3634851 at *6-8

(S.D. Cal. Aug. 17, 2021)).

### 3.    Analysis

Plaintiff contends Defendant's "failure to adjust the regular rates, and then pay overtime,

when it pays bonuses violates the FLSA" as a matter of law. (Doc. 91 at 5). According to Plaintiff,

Defendant violates the FLSA by not 1) paying the percentage bonus on the month during which

the wages are earned or 2) recalculating the overtime wages, inclusive of the bonus amount, on

the paychecks in which the bonus is paid. (*Id*. at 5-10). Plaintiff argues the applicable regulations,

case law, and Department of Labor Wage and Hour Opinion Letters support his position that the

temporal disconnect between the bonus calculation period and the wages on which the bonus is

ultimately paid violates the FLSA.

Defendant does not dispute its bonus is nondiscretionary and must be included in its

employees' regular rate of pay. Rather, Defendant submits (1) its Incentive Plan results in the

payment of an FLSA compliant percentage bonus and (2) there is no dispute Plaintiff was properly

paid his overtime.  (Docs. 100 and 112).  Defendant argues no law requires a correlation between the wages to which the percentage is applied and the wages earned during the period when the metrics are gathered to determine the relevant percentage.  (*Id.*)  More specifically, Defendant contends 1) "nothing in Section 778.210 requires that the percentage bonus be included in the regular rate or apportioned over the period it is "earned"; 2) the FLSA does not dictate the manner in which an employer awards a bonus; 3) Plaintiff has failed to cite a single case which holds that a percentage bonus like OTK's fails to properly account for overtime compensation; and 4) its bonus scheme was not a device to evade the overtime requirements.  (Doc. 100, citing 29 C.F.R. § 778.210).  Further Defendant argues it would be a hardship for it to calculate the bonus on the pay for time worked during the month because doing so would require Defendant to split work weeks and arbitrarily assign overtime pay to one portion of a workweek when the workweek straddles a calendar month.  (Doc. 100).

In essence, Defendant disagrees with Plaintiff's interpretation of the regulations and case law.  Defendant observes courts have consistently applied Section 778.210 to uphold the validity of bonuses calculated as a percentage of total earnings.  (Doc. 100 at 19).  Indeed, this is true; however, Defendant fails to acknowledge in these cases the bonus calculation period and the wages on which the percentage bonus was paid are in alignment.  As such, the precise issue presented by the structure of Defendant's Incentive Plan – whether the bonus calculation period and the wage period must be in alignment in order for a percentage bonus to comply with the FLSA's overtime mandates – has not been considered by either a federal court or the Department of Labor.  Notwithstanding this lapse, the cases, cited by both Defendant and Plaintiff, support Plaintiff's motion for summary judgment and not Defendant's.  These cases support Plaintiff's

position not because they explicitly say the bonus calculation period and the period during which the wages are earned must align, but because they recognize temporal alignment as a basic principle underlying the bonus scheme in each case.

For example, Defendant cites to *Barragan v. Home Depot U.S.A.*, Inc. for support even though its own parenthetical contradicts its argument.[1]  This Court, too, has cited to *Barragan*, as illustrating the importance of the "bonus calculation period."  *See Hornady II*, 2022 U.S. Dist. LEXIS 28911, *27-28 ("As the name implies, Home Depot requires a store to achieve at least 95% of its financial targets before it allocates a Success Sharing (percentage bonus) to employees.  If the store achieves these metrics during the bonus calculation period, Home Depot applies a small percentage to an employee's earnings (regular and overtime) during the bonus calculation period to determine the bonus for each eligible employee."  (citing *Barragan v. Home Depot*, 2021 U.S. Dist. LEXIS 154978, at *21 (S.D. Cal. August 17, 2021)).  In *Barragan*, the court granted plaintiff's summary judgment because Home Depot rounded up the percentage bonus to a $100 (when the calculation netted an amount less than $100) in order to give a more "meaningful bonus.")  *Id.* The court observed Home Depot's "good deed of providing each employee a meaningful bonus to award workers for their productivity has exposed it to litigation . . . if [Home Depot] did not increase the payout to achieve a $100 Success Sharing bonuses, plaintiffs would have no overtime claim at all because these bonuses would be a straightforward percentage bonus."  *Id.* at 23-24. Plaintiff, as with plaintiffs in *Barragan*, argues Defendant's failure to pay its percentage bonus on

---

[1] *See* Doc. 112, fn 2 (*See Barragan v. Home Depot U.S.A., Inc.*, 2021 WL 3634851, at *6-8 (S.D. Cal. Aug. 17, 2021) (holding that *a percentage-based bonus under § 778.210 must simply constitute the same percentage of both regular and overtime pay for the same period of time* and finding that the employer did not award a "percentage-based bonus" because it was a flat $100 payment and not a percentage of regular and overtime pay, and noting, "[t]he parties are in agreement that the bonuses that exceeded $100 were 'percentage-based' bonuses in which no overtime premium is owed.") (emphasis added).

wages earned during the bonus calculation period – here, the calendar month – effectively converts Defendant's bonus to a lump sum payment, requiring the regular rate to be recalculated to include the bonus amount.

Defendant also cites *Weninger v. General Mills Operations, LLC*, 344 F. Supp. 3d 1005, 1008-09 (E.D. Wisc. 2018).[2]  Defendant points out, correctly, the method of calculation was not at issue in *Weninger*; rather the plaintiff took issue with how its "total earnings" were composed and whether the percentage was an accurately applied to its "total earnings."  *Weninger*, 344 F. Supp. 3d at 1008-09.  Defendant argues *Weninger* does not "even discuss[ing] the specifics regarding the pay periods covered by the employer's semiannual Wage Incentive Bonuses." (Doc. 100).  Defendant's reliance is misplaced.  In *Weninger*, the court considered two different bonus schemes.  When discussing the "wage incentive bonus" – a percentage bonus – the court observed that the "percentage is multiplied by the employee's 'eligible earnings' (a term used by General Mills, not the FLSA), including regular (or "straight") pay, overtime pay, and holiday pay combined.  The product of that calculation is the total Wage Incentive Bonus *for the year*. . .". *Weninger*, 344 F. Supp. 3d at 1008.  (emphasis added).[3]  Accordingly, although Defendant is correct: the *Weninger* opinion did not discuss the specifics regarding the pay periods covered by the employer's semi-annual wage incentive bonus – it did not need to because the bonus calculation method was not at issue.

---

[2] The Plaintiff also relied on *Weninger*, and, the Court has previously relied on *Weninger*.

[3] The briefing clarifies General Mill's wage incentive bonus was an annual bonus, paid in two installments, calculated as a percentage of the employees' earnings over the course of the year times various factors (plant rating, cell rating and individual rating).  See Defendant's Memorandum in Support of its Motion for Partial Summary Judgment)*(John WENINGER, on behalf of himself and all others similarly situated, Plaintiff, v. GENERAL MILLS OPERATIONS, LLC, Defendant., 2018 WL 8369568 (E.D. Wis. July 13, 2018).  As the briefing observed and the plaintiff admitted, "there [was] no dispute about how the plaintiffs wage incentive bonus was calculated," rather the dispute concerned the number that made up the plaintiff's total wages.  *Id*.

Defendant also cites to *Brock v. Two R Drilling Co.*, 789 F.2d 1177, 1180-81 (5th Cir. 1986) for its proposition that no cases support Plaintiff's position.  A closer evaluation of *Brock* reveals the stipulated facts demonstrate the percentage bonus "was calculated as fifteen hours (one component of ten hours and another of five) of pay and was payable only to those who worked the full eighty-four-hour (eighty-seven-hour, including the 'travel time') regularly scheduled workweek, and met the other four enumerated conditions . . ." *Id.*  The Fifth Circuit observed the bonus was always the same constant percentage "of each employee's total wages for the eighty-four-hour (eighty-seven with travel time) regularly scheduled workweek, namely, in each case and for every such employee, 13.57466 percent or 15/110.5ths."  *Id.*  As such, the percentage bonus amount was tied to a fixed, and immediate, period of time the employee worked.  Giving further credence to the import of the bonus calculation period, the Fifth Circuit remanded *Brock* to discuss how the percentage bonus would operate when an employee worked over the scheduled regular eighty-four hour (plus travel) shifts.  *See Id.* at 1181 ("We are cited to no authorities dealing with the effect of some few shifts unexpectedly lasting slightly more than eighty-four hours (plus travel) for which no greater bonus was actually paid on the 'percentage' status of the bonus as to the other shifts which lasted only the scheduled regular eighty-four hours (plus travel).").  Unlike the scheme at issue in *Brock*, under Defendant's Incentive Plan, the percentage bonus is neither fixed nor tied to a fixed period of earnings.

Defendant also relies on *Breig v. Covanta Holding Corp.* to assert "Courts have consistently applied Section 778.210 to uphold the validity of bonuses calculated as a percentage of total earnings."  (*See* Doc. 100 at FN5, citing to *Breig v. Covanta Holding Corp.*, 2022 WL 837242, [*3] (E.D. Pa. Mar. 21, 2022) ("[t]he United States Department of Labor has repeatedly

determined that bonuses paid using the 'percentage of total earnings' method fully satisfy the FLSA's overtime provisions . . . ").  In *Breig*, the annual incentive bonus was calculated as a percentage of the plaintiff's straight time and overtime earnings, earned over the year, therefore, it complied with the FLSA as a matter of "arithmetic fact."  *Id*.  Here, the arithmetic does not work out under Defendant's Incentive Plan because the percentage is not tied to the wages earned during the bonus calculation period.

Defendant also argues *White v. Publix Super Markets, Inc*. supports its position that a percentage bonus that paid a percentage of the employee's straight-time and overtime earnings satisfied the FLSA's requirements for percentage bonuses.  2015 WL 4949837 (M.D. Tenn. Aug. 19, 2015).  In *White*, the retail bonus was paid each quarter, as a percentage of eligible employees' total earnings that quarter.  *Id.*, at *17.  The retail bonus was described as "not fixed or automatic", but one that was calculated each quarter based on certain quarterly metrics including profit and individual store performance.  *Id*.  Once the percentage was determined for each store, the bonus was paid as a percentage of eligible employees' total earnings for that quarter.  *Id*. As in *Weninger*, the method or bonus calculation period was not in dispute; rather the employees disputed what constituted "total earnings" and urged the court to incorporate "all remuneration for employment" within the meaning of the phrase  *Id*. at *17-18.

Defendant and Plaintiff rely on *Russell v. Gov't Employees Ins. Co*.  2018 WL 1210763 (S.D. Cal. Mar. 8, 2018), aff'd, 787 F. App'x 953 (9th Cir. 2019).  (*See* Docs. 91 and 100).  Defendant cites *Russell* for the general proposition that Section 778.210 permits employers to satisfy FLSA's overtime compensation requirements by calculating the bonus as percentage of both the employee's regular and overtime earnings.  (Doc. 100, citing *Russell*, at *3-4.)  Plaintiff cites

*Russell* for his assertion a "permissibly calculated percentage bonus that does not require recalculation of overtime pay must be applied to the earnings for the same period in which the bonus was earned." (Doc. 91).

This Court relies on *Russell* once again. As an hourly employee, Russell received a percentage bonus in February, calculated against her total wages earned during the prior calendar year. *Hornady II at *10* (citing *Russell*, at *9). Russell argued the "cash bonuses are not based on a percentage of its employees' total earnings because the bonuses are a percentage of twelve months wages, but employees are required to 'earn' the bonuses over fourteen months." *Russell*, at *4. Russell's interpretation relied on a DOL, Wage & Hour Div., Opinion Letter which included the following phrase: "payments would include the same percentage of both the employees' straight time earnings and any overtime compensation paid to the employees for *the period in question*." *Russell,* at *4 (quoting U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter 1997, 1997 WL 998000, at *1 (Jan. 23, 1997)). "The court considered [Russell's] interpretation of the Department of Labor opinion letter, and determined the [Russell] overlooked the fact than an employee working in January and February is earning a bonus for that calendar year, payable the following February." *Hornady II at *10* (citing *Russell, at *10)*. "Ultimately, the court determined the bonus need not factor in the wages earned during January and February because the 'period in question' is the prior calendar year." *Hornady II at *10* (citing *Russell, at *12)* (quoting DOL WH. Op. Ltr., 1997 WL 998000 at *1 (Jan. 23, 1997) ("[t]he period in question here is the twelve months of year one").

Here it is undisputed that the resulting percentage (whether 3%, 24% or anywhere in between) is fixed based on metrics collected over a calendar month. It is also undisputed that

"the calendar month when a bonus is earned is never the same as the 4 weeks (or sometimes 6 weeks) of pay that the bonus percentage applies to." (Doc. 92, citing Doc. 86-1).  This temporal disconnect means Plaintiff's bonus payment is not reflected in his overtime pay from the period during which his bonus was earned.  Defendant's Incentive Plan undermines the very goal it is set to achieve and flaunts the statutory premise behind percentage-based bonuses.

A percentage-based bonus is an exception to the general rule that the regular rate of pay must be recalculated to include a nondiscretionary bonus.  In order to be valid, the percentage must be paid on both the overtime and regular time earnings at the same time so that the increase is simultaneous and "the math works out."  A percentage bonus that pays a percentage on earnings not earned during the bonus calculation period is not a permissible percentage bonus because it fails to recalculate the regular rate of pay of the overtime incurred / worked during the bonus calculation period.  Plaintiff's motion for summary judgment on the bonus violation theory is GRANTED.

B.    The Rounding Practices Violation Claim

Plaintiff asserts he is due summary judgment as a matter of law on his claim that Defendant's rounding practices failed to pay him all the overtime pay he was entitled to for compensable time he worked more than 40 hours a week.  (Doc. 92).  In essence, Plaintiff insists, as a result of Defendant's rounding policy, he worked overtime without compensation and Defendant knew of his overtime work.  *See Allen*, 495 F.3d at 1314-15 (citing *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1081-82 (11th Cir. 1994)) ("to prevail on a claim for unpaid overtime compensation, the plaintiff bears the initial burden to demonstrate that:  (1) he

or she worked overtime without compensation, and (2) the employer knew or should have known of the overtime work.").

### 1.    The Undisputed Facts

Plaintiff was employed as a Big Red Operator (forklift operator) at Defendant's mill from August 2015 – February 2021.  (Doc. 92).  He was responsible for moving coils of steel from various points in Defendant's mill.  (Docs. 92 and 84-1 at 25).  Plaintiff's scheduled day shift start time was 6 a.m.; his scheduled shift end time was 6 p.m.  (Doc. 92). When he was scheduled to work nights, his shift start time was 6 p.m. and shift end time was 6 a.m.  *Id.*  Plaintiff claims he was required to "make relief" just before and after his shift start and end times.  (Doc. 84-1).  As a result of Defendant's rounding policy, he was not paid for that time.  (Doc. 92).

> Gibson's main responsibility involved moving coils / rolls of steel to and from various points in OTK's manufacturing process. (Doc. 84-1, PageID.981, 985-987, 991-994, 996-998, 1006, 1012; Doc. 84-4, PageID.1090-1091) In addition to driving forklifts Gibson used cranes to move coils. (Doc. 84-1, PageID.999-1000) Typically, but not always, Gibson worked 12-hour shifts. (Docs. 83-1, 89-2) During a shift, Gibson would find out what coils needed to go where and when a variety of ways. Sometimes Gibson was told what needed to be moved by text; sometimes there were written instructions; sometimes there were oral instructions, sometimes there were line sequence schedules (which were subject to change); sometimes instructions were on other pieces of paper. (Doc. 84-1, PageID.1001-1005, 1007-1008).

(Doc. 92 at 9).  Throughout Plaintiff's employment period, Defendant operated according to four different time clock rounding policies.  (Docs. 92; 87-2-4).  As of May 6, 2018, it is undisputed that Defendant rounds an employee's clock in or clock out time to the shift start or shift end time. (Doc. 87-2) ("Employees may clock in up to 7 minutes prior to scheduled shift start time without penalty.  Pay will begin at the scheduled shift start time.  (5:53 = 6:00).").  The rounding policy in place prior to May 6, 2018, could result in as much of thirty minutes of rounded off time.  (Doc.

92).

The August 2018 and April 2020 versions of the "Team Member Handbook" also contain a "Time Clock Policy" section within Section 6 ("Time, Attendance and Compensation").  (Docs. 87-3 and 87-4).  Under the "shift start rounding" portion of the time clock policy, if a team member clocks in more than seven minutes prior to scheduled shift start time, the "general rounding policy" will apply and the employee may be subject to discipline, including termination. *Id.*  The end of shift rounding policy indicates that an employee who clocks out up to seven minutes following their scheduled shift end time, the time clock will round back to the actual scheduled shift end time.  *Id.*  A team member who clocks out more than seven minutes following the scheduled shift end time will be paid in accordance with the "general rounding policy, but may be subject to discipline." *Id.*  The general rounding policy rounds time down or up in seven-minute increments.  *Id.* In the 2020 handbook, Defendant amended its "shift start rounding" and "end of shift rounding" policies to include the following statement:  "Anytime worked within the rounded time will be approved for payment by the team member's manager through the time and attendance system.  (Doc. 87-4).

### 2.   Regulations / Legal Standards pertaining to Rounding Practices

In general, an "employer must total all the hours worked by the employee for him in that workweek. . . and pay overtime compensation for each hour worked in excess of the maximum hours applicable under section 7(a) of the Act. . ."  *See* 29 C.F.R. § 778.103.  As a general rule, "time clocks are not required."  *See* 29 C.F.R. § 785.48(a) ("use of time clocks").  However, when a time clock is used by the employer, the federal regulations provide two exceptions to allow the employer to avoid paying from clock in and clock out time.  First, if an employee voluntarily comes

in early and does not engage in any work prior to his "regular starting time" or after "closing time," the employee does not have to be paid according to the time clock punches.  (*Id.* ("Their early or late clock punching may be disregarded.")).  The second exception, time clock rounding, is discussed in this same regulation.  *See* 29 C.F.R. § 785.48(b)("rounding" practices).  In "some industries," an employer may round time "to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour." 29 C.F.R. § 785.48(b).  "Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work." *Id*.  Generally, the regulations permit "rounding practices" as long as the rounding "will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."  *See* 29 C.F.R. § 785.48(b); *see also Corbin v. Time Warner Entm't-Advance/Newhouse P'ship*, 821 F.3d 1069, 1075 (9th Cir. 2016) (noting that federal regulation has endorsed use of rounding for over 50 years).  Stated differently, a valid rounding policy must be "neutral, both facially and as applied."  *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1288 (10th Cir. 2020) (quoting *Corbin*, 821 F.3d at 1076 (internal citations omitted)).

### 3.    Analysis

First, Plaintiff contends Defendant's rounding practices violate the FLSA, as a matter of law, because the policy is neither facially neutral nor neutral as applied.  (Doc. 91).  Plaintiff argues "Defendant's rounding policy is not facially neutral (because of the related disciplinary threats) and it is not neutral as applied (because time is almost always rounded in OTK's favor)." (Doc. 91).  Defendant does not contest the non-neutrality of its rounding practices.  For this reason, based on the undisputed facts, the Court finds Defendant's rounding practices are in violation of 29 C.F.R. § 785.48(b) as a matter of law.  Irrespective of this violation, Defendant

argues Plaintiff is not entitled to summary judgment because 1) the rounded off time during

which Plaintiff was "making relief" was not compensable work; and, 2) even if the rounding policy

resulted in uncompensated time, Plaintiff's uncompensated work time is offset entirely by the

paid 30-minute meal break.  (Doc. 112).  Defendant articulates four reasons why Plaintiff is not

entitled to damages for the rounded off time:

> 1)  whether Plaintiff performed compensable work prior to or after his shift is a jury question;
>
> 2)  "making relief" is not compensable work because it is not integral and indispensable to a principal activity;
>
> 3)  in the event "making relief" is compensable work, it is de minimis; or,
>
> 4)  in the event the rounding policy does fail to compensate Plaintiff properly for all time he worked, any rounded off time is offset entirely by a paid 30 minute meal break per shift during which Plaintiff was not required to work.

*(Id.)*.

Defendant relies on the Portal-to-Portal Act to support its contention it is not required to

pay for preliminary or postliminary shift activities, such as "making relief."  *See* 29 U.S.C. § 254.

The Portal-to-Portal Act exempts certain activities from compensation under the FLSA, such as

"walking, riding, or traveling to and from the actual place of performance of the principal activity.

. .which such employee is employed to perform."  29 U.S.C. § 254(a)(1).  Further, an employer is

not required to pay an employee for "activities which are preliminary to or postliminary to said

principal activity or activities, which occur either prior to the time on any particular workday at

which such employee commences, or subsequent to the time on any particular workday at which

he ceases, such principal activity or activities."  29 U.S.C. § 254(a)(2).

"The Supreme Court has long interpreted the term 'principal activity or activities' in § 254 to include all activities that are an 'integral and indispensable part of the principal activities.'" *Llorca v. Sheriff, Collier Cty*., 893 F.3d 1319, 1323 (11th Cir. 2018) (quoting *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956) ("[A]ctivities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the [FLSA] if those activities are an integral and indispensable part of the principal activities for which the covered workmen are employed.")). "[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under § 4(a) of the Portal-to-Portal Act." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005). Such an activity commences the continuous workday and marks the beginning of compensable time. *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1349 (M.D. Ala. 2009) (citing *Alvarez*, 546 U.S. at 37).

In *Llorca*, the Eleventh Circuit concisely stated the framework a district court should employ to analyze whether certain activities are compensable work as follows:

> Thus, § 254(a), *Integrity Staffing*, *IBP, Inc. v. Alvarez*, and *Bonilla* establish for this Circuit that commuting time and other preliminary and postliminary activities are compensable only if they are both an integral and indispensable part of the principal activities. The inquiry is fact-intensive and not amenable to bright-line rules. Nevertheless, whether a particular set of facts and circumstances is compensable under the FLSA is a question of law for the Court to decide. *Dade Cty. v. Alvarez*, 124 F.3d 1380, 1383 (11th Cir. 1997) ("[I]t is for the court to determine if a set of facts gives rise to liability [under the FLSA]; it is for the jury to determine if those facts exist." (quoting *Birdwell v. City of Gadsden*, 970 F.2d 802, 808 (11th Cir. 1992)).

*Llorca*, 893 F.3d at 1324.; *see also Dade County v. Alvarez*, 124 F.3d 1380, 1383-1384 (11th Cir. 1997) ("The question of whether a particular set of facts and circumstances constitutes work under the FLSA is a question of law.").

a.     "Making Relief" is Integral and Indispensable to Plaintiff's Principal Activity

The first question is whether Plaintiff's "making relief" was integral and indispensable to the principal activity (operating the Big Red forklift) and was, therefore, compensable work. Plaintiff maintains there is no material dispute that during the rounded off time he was performing compensable work in the form of "making relief." (Doc. 117). Plaintiff was responsible for moving large coils of steel throughout the Mill. (Doc. 92). The Mill runs 24/7 and certain processing lines run continuously. (Doc. 84-3). The planning department makes a line sequence 12 hours in advance. *(Id.).* The forklift drivers have a run sequence list showing where coils need to be moved throughout the Mill. *Id.*

Plaintiff described "making relief" as an activity occurring after he clocked in or before he clocked out: "I clocked in and then walk back out and make relief with them." (Doc. 84-1). When asked if he made relief every day, Plaintiff said "for the most days, yes"; and, "even when I was running late." *Id.* Plaintiff explained, "once in a blue moon" that if he was running late, he would make relief by phone or text. (Doc. 84-1 at 51-52). Plaintiff described "making relief" as "a hand off" between him and the forklift operator he was replacing, or the one coming on shift to replace him. (Docs. 91, 92, and 84-1). During the "hand off," the two forklift operators would talk about from which processing lines coils needed to be moved, the priority of coils that needed to be moved, where the last operator left off, and where in the Mill the next operator needed to go. (Doc. 84-1 at 50-51) ("because I didn't know what sequences he was running on, what he was pulling on. I had to figure out where he left off so I could pick up"). When asked if this could be seen from the sequence schedule, Plaintiff responded, "I still wouldn't know what he moved and what." (Doc. 84-1 at 51). In addition, the two operators would talk about the about the forklift,

whether there was any issue with how the forklift was running, and then Plaintiff would perform his equipment check. (*Id.* and Doc. 91).

Despite these undisputed facts, Defendant argues "making relief" was not integral and indispensable to Plaintiff's principal activities, because it was neither required nor necessary, and mostly for the benefit of Plaintiff. (Doc. 112). There are two problems with Defendant's argument. First, Defendant relies on the wrong test.[4] The Supreme Court refined the "integral and indispensable test" in *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014). An activity is "integral and indispensable" to the performance of an employee's principal activities if "it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities*." Integrity Staffing*, 574 U.S. at 36-37 (observing the Court of Appeals "erred by focusing on whether an employer *required* a particular activity and rejecting the "required" and "primarily benefits the employer" prongs of the *Bonilla* test as overly broad). In other words, "an activity is 'indispensable' to another, principal activity only when an employee could not dispense with it without impairing his ability to perform the principal activity safely and effectively." *Integrity Staffing*, 574 U.S. at 37-38 (Sotomayor & Kagan, JJ., concurring). Furthermore, "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*." *Integrity Staffing*, 574 U.S. at 36 (emphasis in original) (citing *IBP*, 546 U.S., at 42, 126 S.Ct. 514; *Mitchell [v. King Packing Co., 350 U.S. 260]* at 262, 76 S.Ct. 337;

---

[4] "A court in the Eleventh Circuit must consider three factors to determine whether some preliminary or postliminary activity is integral and indispensable to a preliminary activity and is therefore itself a principal activity: (1) Whether the activity is required by the employer, (2) Whether the activity is necessary for the employee to perform his or her duties; and (3) whether the activity primarily benefits the employer." *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1349 (M.D. Ala. 2009) (citing *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007)). The *Bonilla* test draws heavily from the Supreme Court's decision in *Alvarez*: "For tasks to be "work," they must be "pursued necessarily and primarily for the benefit of the employer." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005).

*Steiner*, 350 U.S., at 249–251, 76 S.Ct. 330; *see also* 29 CFR §790.8(a) (explaining that the term "principal activities" was "considered sufficiently broad to embrace within its terms such activities as are indispensable to *the performance of productive work*" (internal quotation marks omitted; emphasis added)); §790.8(c) ("Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable *to its performance*" (emphasis added)).  Under *Integrity Staffing*, Defendant's argument that "making relief" was not required and was primarily for the benefit of Plaintiff has no place in the analysis as to whether it was integral and indispensable to the "productive work" Plaintiff was employed to perform.

The second problem with Defendant's contention is the testimony of its supervisory employees.  Defendant's Team Manager Bedwell explained "making relief" as follows: "If I'm a big red driver, and I'm coming to you and I'm making a shift relief, I'm telling you this is what I moved.  This is our next sequence number for the HAPL line.  This is what I forecast coming to me today.  You'll probably have 20 coils to move.  This is going on, and that's it.  Shift relief made." (Doc. 84-3 at 31-32).  Further, Bedwell stated, "good relief always makes your day or night go by better"; and, "good relief is a key to being successful in anything that you do." (*Id*. at 32).  Similarly, Plaintiff's immediate supervisor, Wilkie, explained "making relief" as follows:

> "[Gibson] would meet up with the other forklift operator and let him know which line was running. . .Like if coils are coming off the HAPL, that hey, HAPL is getting closed off, most of them are coming to CMPL or going straight to shipping.
> If the other shift did not have somebody at the HAPL entry, if coils needed to be moved over to the HAPL entry.  If coils coming off the CMPL needed to be moved over to the cold rolling lines, anything like that.  Just kind of giving him an idea of where he needed to start when he comes on shift so he could kind of start moving those coils in the same manner.

(Doc. 84-4 at 32-33).  Wilkie testified "making relief" was something the employees were expected to do as part of their job performance and that they would never get paid for it.  (*Id*. at

33, 43, and 45). Wilkie said he was instructed by Defendant to only pay people for clocking in early when they actually began working the "physical part of the job" "such as using the crane [or] helping on the line," but not for "making relief." (*Id*. at 40-41).

Applying the above facts to the test set forth in *Integrity Staffing*, this Court finds "making relief" – though a preliminary and postliminary activity – to be "integral and indispensable" to the performance of Plaintiff's primary activity of moving coils from one point in the Mill's manufacturing and shipping process to another. The conversation between Plaintiff and the outgoing (or incoming) forklift operator is compensable work, marking the start (or end) of the workday. "Making relief" was indispensable to the safety and efficiency of the principal activity – driving coils from one line on the steel mill to another – that Plaintiff was there to perform.

For all of the above reasons, the Court finds "making relief" between the forklift operators to be an activity "integral and indispensable" to the performance of Plaintiff's principal activity.

       **b.**    **There is no Genuine Dispute of Fact as to Whether Plaintiff Performed Compensable Work during the Rounded off Time**

Next, Defendant argues whether Plaintiff performed any work during the rounded off time prior to and after his shift is a jury issue.[5] (Doc. 112). Defendant argues courts routinely "deny plaintiffs' summary judgment motions on rounding or work-before-shift claims when disputed facts like these exist on whether the plaintiff performed work tasks before the shift and whether those tasks were compensable under the FLSA." (*Id.*). However, Plaintiff correctly points out, in those cases, there were "different evidentiary records." (Doc. 117). Plaintiff insists the

---

[5] Defendant argued there was a genuine dispute of fact as to whether Plaintiff performed these "making relief" activities every day. (Doc. 112). However, Defendant has presented no records beyond the clock out times. Therefore, Defendant has no evidence to dispute the testimony in the record.

"undisputed evidence" is that Plaintiff was performing compensable work that was rounded down for the vast majority of the shifts. (Doc. 117).

Plaintiff is correct.  Here, the only employer-maintained records are the time clock records.  Defendant cannot produce any substantive evidence which discerns times Plaintiff did not "make relief" during the rounded off time, *i.e.* whether Plaintiff was making relief or sitting at the break table during the rounded off time.  In fact, Defendant has produced quite the opposite.  Defendant's own employees testified good relief was the key to a "successful shift" and that the employees were expected to make relief.  (Docs. 84-3 and 84-4).  Defendant's 30(b)(6) deponent, Bedwell, testified he could never think of time when Plaintiff was not performing duties "integral and indispensable to Plaintiff's principal work activities."  (Doc. 84-3 at 8).  When asked directly if he knew of times when Plaintiff was not working, Bedwell said, "no." (Doc. 84-3).  Later, Bedwell explained the general conditions at the Mill:  "There is always work to be done at OTK.  And if the lines are down, we're cleaning.  We're doing housekeeping; we're training.  We're always going to be doing something." *Id.*  Similarly, Plaintiff testified ". . .even when [he] was running late, then [he] still go outside, make relief with [his] counterparts."  (Doc. 84-1).  Through this deposition testimony of Defendant's employees, Plaintiff has demonstrated that he was "making relief" during the rounded off time.

> **c.    There is no genuine dispute of fact as to whether the compensable work is "*de minimus*"**

Next, Defendant argues, if "making relief" is compensable work, summary judgment should be precluded because "making relief" required so little time as to be *de minimus* as a

matter of law.[6]   In the alternative, Defendant argues there is a genuine issue of material fact as to whether the amount of time spent "making relief" is *de minimus* and therefore, should be excluded from compensation.   (Doc. 112).   For support, Defendant relies, in part, on the testimony of Bedwell who stated: "[…] shift handover, shift relief, whatever you want to call it, takes maybe two minutes." (Doc. 84-3).

The Supreme Court in *Anderson v. Mt. Clemens Pottery Co.,* explained the *de minimis* rule as follows:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

328 U.S. 680, 692 (1946).  The Court recognized the application of the rule to the time involved (time spent walking from the time clock to the work bench) could only be determined after the trier of fact made more definite findings as to the amount of time in issue.   *See id*.   When considering whether time spent on the employees' preliminary activities was considered *de minimus*, the Court determined it was the duty of the trier of fact "to draw whatever reasonable inferences can be drawn from the employees' evidence as to the amount of time spent in these activities in excess of the productive working time." *Id. at 693.*  The Supreme Court remanded the case for the determination of the amount of walking time involved and the amount of preliminary activities performed, giving due consideration to the *de minimis* doctrine and calculating the resulting damages under the Act.  *Id.* at 693-694.

---

[6] Defendant did not move for summary judgment on Plaintiff's rounding practices claim and the Court is not certain what Defendant intended by this argument.   In order to prevail on its *de minimus* defense, Defendant must demonstrate there is a genuine dispute of fact that the rounded off time is *de minimus*.  *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 693-694 (1946).

A compensable "integral and indispensable" activity is rendered noncompensable if the time spent performing that activity is *de minimis*. *Freese v. Treecycle Land Clearing Inc.*, 2019 WL 2637298, *3 (S.D. Fla. April 10, 2019). "When applying the *de minimis* rule in FLSA cases, courts have acknowledged that this rule cannot be applied 'with mathematical certainty.' The rule does not rigidly prescribe a certain number of minutes per day below which constitutes *de minimis* time." *Cowan v. Talladega Healthcare Ctr.*, 2007 WL 9711405, *2 (N.D. Ala. December 5, 2007) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (citing *Frank v. Wilson & Co.*, 172 F.2d 712, 716 (7th Cir. 1949); *Nardone v. General Motors, Inc.*, 207 F. Supp. 336, 341 (D.N.J. 1962)). The attendant regulations to the FLSA also maintain: "In recording working time . . . insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded." 29 C.F.R. § 785.47 "When applying the *de minimis* rule to otherwise compensable time, the following considerations are appropriate: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Burton v. Hillsborough Cnty, Fla.*, 181 F. App'x at 838 (quoting *Lindow*, 738 F.2d at 1063; *see also* 29 C.F.R. § 785.47 ("An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him."). In *Burton*, the Eleventh Circuit considered the county's argument that the time spent traveling from the County's parking site to the work site in the county-required vehicle was *de minimus* by applying the *Lindow* factors. *See Burton*, 181 Fed. App. 829, 838. The Eleventh Circuit found no practical reason for why the county could not record the time when its employee

returned to the parking site at the end of the day, as opposed to when the day ended at the work site. *See id.* at 839. Similarly, the Eleventh Circuit found there was no evidence to refute Burton's assertion that it took him 45 minutes to an hour and a half of the day to commute to and from the county parking site, and that this did not amount to a "mere trifle." *Id*. Finally, the Eleventh Circuit observed that this commute was a regular part of the employee's workday. *Id.* The Eleventh Circuit concluded the travel time to and from the parking site was not *de minimus*. *Id.*

Thus, in order to mount a successful defense to Plaintiff's motion for summary judgment, Defendant must demonstrate there are genuine disputes of fact concerning the following factors: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work. On this record, Defendant cannot succeed. The time rounded off Plaintiff's compensation was recorded in Defendant's time clock records and there is no practical administrative difficulty of recording the additional time. Similarly, because the amount of time rounded off has already been recorded by Defendant, there is no question over the aggregate amount of compensable time which Defendant has recorded, but now argues is *de minimus*. Finally, there is no dispute that time is rounded off Plaintiff's pay on a regular basis. As noted above, these undisputed facts are demonstrated both by the time clock records and deposition testimony of the Defendant's employees. (Doc. 84-3 and 84-4). As a result, Defendant's *de minimus* argument does not defeat summary judgment.

> ### d. Defendant cannot demonstrate Plaintiff received "bona fide meal periods."

Defendant's final argument is that even if the "rounding policy resulted in uncompensated time, OTK's rounding practice is offset entirely by the paid 30-minute meal break

OTK paid him for meal periods in which he was not required to work." (Doc. 112). Defendant urges the Court to accept Plaintiff was paid for more time he alleges he worked because it was Defendant's practice to include a paid, 30-minute meal break in each shift. (*See id.)*. Defendant argues the paid meal breaks should be an offset, or credit, against any alleged unpaid overtime.[7] (*See id.*). Further, summary judgment for the Plaintiff should be denied because, at the very least, the fact that Plaintiff did receive some paid meal breaks creates a material dispute of fact as to when Plaintiff worked without pay. (*See id*.)

Before Defendant can claim the credit or offset, it must first demonstrate Plaintiff received 30-minute bona fide meal periods for each shift it intends to claim a credit. Under Department of Labor regulations, "bona fide meal periods" are "not worktime." 29 C.F.R. § 785.19(a). "Bona fide meal periods" are breaks in which an "employee [is] completely relieved from duty for the purposes of eating regular meals." *Id.* A break is not a "bona fide meal period" if the employee is required to perform any duties, whether active or inactive, while eating. *Id.* An employer need not pay employees for time spent on "bona fide meal periods" since that time

---

[7] Defendant relies o*n Avery v. City of Talladega, Ala.* for its contention the paid meal breaks may be used to offset overtime compensation due. 24 F.3d 1337, 1344 (11th Cir. 1994) ("If the meal break is not compensable time under the FLSA, then the [employer] should be allowed to offset the amount it pays for the meal break against any amount it owes the plaintiffs for pre-and post-shift time at work."). Plaintiff argues the Eleventh Circuit's analysis in *Avery* is both in error and/or inapplicable. Indeed, the Circuits are split as to whether a defendant-employer may claim an offset, or credit, against any liability under the FLSA for wages paid as part of its regular rate of pay, or as Defendant did here, for a meal break employees were told would be paid. See *Alonso v. 144 Ninth Gotham Pizza, Inc.*, 2016 U.S. Dist. LEXIS 106028, *1-9 (discussing circuit split and acknowledging the Second Circuit "has yet to address whether an employer, after voluntarily paying for "bona fide meal periods," may offset its liability under the FLSA"); see *also Smiley v. E.I. DuPont De Nemours & Co.*, 839 F.3d 325, 328, 2016 U.S. App. LEXIS 18242, *3-4, 167 Lab. Cas. (CCH) P36,476, 26 Wage & Hour Cas. 2d (BNA) 1753. The Circuits have split on whether employers may offset liability under the FLSA and NYLL for amounts they voluntarily paid during employee breaks. Compare *Ballaris v. Wacker Siltronic Corp*, 370 F.3d 901, 914 (9th Cir. 2004) (no offset), with *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1344 (11th Cir. 1994) (allowing offset) and *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 711 (7th Cir. 1996) (same).

   Plaintiff makes a compelling argument that the Eleventh Circuit's reasoning in *Avery*, which involved public agency employees, is not applicable to a private employer; however, because this Court has determined that Plaintiff did not receive a bona fide meal period, a discussion as to the applicability of *Avery* is unnecessary.

is not work time. *Kohlheim v. Glynn County, Georgia,* 915 F.2d 1473, 1476-77 (11th Cir. 1990) (The court held that "Section 785.19 provides that bona fide meal periods are not worktime"); *see also Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1307 (N.D Ala. Jan 22, 2008). In *Glynn County*, the Eleventh Circuit explained "the essential consideration in determining whether a meal period is a bona fide meal period or a compensable rest period is whether the employees are in fact relieved from work for the purpose of eating a regularly scheduled meal." *Glynn County*, 915 F.2d at 1477. "In assessing whether the employees are completely relieved from duty, the Court must consider: (1) whether the meal period is allotted 'for the purpose of eating a regularly scheduled meal,' (2) whether the employees retain 'significant affirmative responsibilities' during the meal period, and (3) whether 'the employees are subject to real limitations on their personal freedom which inure to the benefit of their employer.'" *Romero v. Fla. Power & Light Co., 2011 WL 13176094,* at *5 (quoting *Chao*, 568 F. Supp. 2d at 1307-08 (citing *Kohlheim*, 915 F.2d at 1477) ("[W]hat matters in meal period cases is whether the employees are subject to real limitations on their personal freedom which inure to the benefit of their employer.")).

In *Romero*, the meal periods were not compensated by defendant, Florida Power & Light Co. Plaintiffs, in a summary judgment motion, argued the meal periods were worktime because they were not completely relieved from duty, and therefore they should be compensated for that time. (*Id*. at *2-*5). Plaintiffs claimed they were required to listen to and respond to company-issued radios during their meal break. *Id.* Defendant argued, relying on company policy, that not all of the plaintiffs had to listen to their radio, but only certain managers and superintendents. *Id*. Denying summary judgment for plaintiffs, the district court determined there was a genuine

dispute of fact concerning the applicability of defendant's policy regarding radio monitoring during lunch break to plaintiffs. (*Id.* at * 5).

Similarly, here, Defendant argues there is genuine dispute of fact, as to whether Gibson took a meal break. Further, if and when Gibson did take a meal break, there is evidence that he "typically received a full meal break." (Doc. 112 at 36-37).   In making this argument, Defendant relies on Gibson's deposition testimony where he says 60-70 percent of the time he took a meal break. (*See id.*).  However, unlike defendant in *Romero*, this Defendant can find no support in its meal break policy or its timekeeping procedures.  Here, there is no dispute of fact that the meal breaks were paid time, treated like any other 30 minutes of the scheduled work shift.[8] Defendant's Vice President, David Scheid, listed paid meal breaks in his declaration as one of the benefits Defendant inured to its employees over and beyond the requirements of the FLSA.  (*See Doc. 99-15)* ("OTK's pay practices have been described as complex. Many of the complexities of OTK's pay system are the result of OTK's policies intended in good faith to benefit the employees and provide them pay beyond that required by the FLSA . . . Below is a list of OTK pay policies that benefit employees but also require RROP Calculations . . . Employees are not required to clock out for lunch or breaks and are paid for the full time of the shift.").  In addition, Plaintiff's immediate supervisor, Wilkie, testified there are no records showing what Plaintiff was doing at any particular time on any shift, whether he took a meal break during any particular shift, and if he did, how long he got to take a meal break.  (*See* Doc. 84-4 at 23-24).   Further, Wilkie testified

---

[8] In this way, the situation is more like *Dupont* and less like *Avery* or *Romero. See Smiley v. E.I. DuPont De Nemours & Co.*, 839 F.3d 325, 328, 2016 U.S. App. LEXIS 18242, *3-4 ("DuPont treated the compensation for meal breaks similarly to other types of compensation given to employees. It included the compensation given for paid meal breaks when it calculated employees' regular rate of pay, and meal break time was included in employees' paystubs as part of their total hours worked each week.").

while he had "heard" about a written rule that hourly employees at OTK were to receive a 30 minute paid meal break every shift, he had never seen the rule. (*Id*. at 25). Finally, Wilkie testified that he supervised employees who were not able to take a meal break and Bradley was "most likely" one of them. *Id*. Lastly, to bolster its lunch defense, Defendant argues Plaintiff could have taken a lunch break, that there was nothing precluding him from doing so. (Doc. 112 at 38-39).

An employer must pay an employee who continues to work. *See* 29 C.F.R. § 785.13. In this instance, it remains undisputed Defendant has no records showing Plaintiff was not working during his regularly scheduled shift time. To be clear, Defendant did not maintain any records distinguishing between Plaintiff's meal break time and scheduled shift working time. In this way, Plaintiff is correct: Because of how Defendant chose to maintain its pay records, and manage its staff, and workflow, Defendant cannot show Plaintiff received regularly scheduled meal breaks. (Doc. 117). As a result, the Court is faced with the very narrow question of whether Plaintiff's deposition testimony that he sometimes took a meal break or his supervisors' testimony that Plaintiff could have taken a meal break is enough to create a material dispute of fact to send Defendant's lunch defense to Plaintiff's rounding claim to the jury.

This Court believes the deposition testimony is not enough to override Defendant's pertinent employment terms (paid meal breaks) and convert that paid time to an offset against unpaid overtime liabilities. The Court finds support for its position in a similar case out of the Southern District of New York. *See Alonso v. 144 Ninth Gotham Pizza, Inc.*, 2016 WL 4257526 (S.D. NY August 10, 2016). In *Alonso*, the defendant-employer, who owned four pizzerias in Manhattan, provided its employees three thirty-minute breaks per day. *Alonso,* at *1. In addition, the employees who worked for the pizzeria delivering pizzas and performing general

duties, were permitted to eat as much pizza as they wished throughout the day. *Id*. The defendants argued that "because the wages they paid to their employees covered any break periods the employees chose to take, the defendants are entitled to offset any damages they must pay for violating the FLSA and NYLL by the amount they voluntarily paid for "bona fide meal periods." *Id*.

The district court disagreed, writing

> Allowing an employer to treat meal breaks as compensable time but then claim an ex post facto credit invites fraud and undermines the goals of the federal and New York labor laws. . . . If an employer has not provided contemporaneous notice to its employees that their break time is non-compensable time, then neither the employer nor the employee has an incentive to monitor and record the use of that time, or to take timely and appropriate action to enforce the employer's policy. Allowing a damages award to be offset by compensation that an employer voluntarily paid above the minimum required by law, rewrites the terms of employment under which the employer and employee functioned. *It also introduces needless complexity into litigation since the existence and extent of the ex post facto offset will rarely be supported by contemporaneous records."*

*Id*. at 2. (emphasis added).

The district court pointed out that was in fact the case at Gotham Pizza, observing that "there was no evidence that any plaintiff was given a 'bona fide meal period,' or any notice that there would be a period of time each day, whether thirty minutes or something else, when they were not on call to perform work for Gotham Pizza. Instead, the owner of Gotham Pizza testified that he permitted his employees to take meal breaks 'as they please.'" *Id*. at *3.   The district court determined that "[t]his catch-as-catch-can opportunity to grab and eat a slice of pizza cannot constitute a bona fide meal period." *Id*.   The district court also determined the employees received no notice that their "paid" meal breaks would offset their overtime pay "and because the defendant did not make it known that it intended to do so, it cannot now offset its liability

under the FLSA and NYLL on the basis of a claim that it paid for employees' meal breaks." *Id*.

The district court found additional support for its opinion in the federal regulations, writing:

> . . . For the same reasons, time in which an employee was on a paid meal break shall not be subtracted in converting that employee's weekly rate of pay into an hourly rate of pay. Moreover, Department of Labor regulations provide that. . .[w]here the parties have reasonably agreed to include as hours worked time devoted to [activities which would not be regarded as working time under the FLSA if no compensation were provided], payments for such hours will not have the mathematical effect of increasing or decreasing the regular rate of an employee if the hours are compensated at the same rate as other working hours. 29 C.F.R. § 778.320 (emphasis added); *see also Ballaris [v. Wacker Siltronic Corp.]*, 370 F.3d [901] at 909 [(9th Cir. 2004)](applying § 778.320 to meal breaks). It can be inferred from this regulation that a subtraction for paid meal breaks is not permitted in the absence of an agreement between the employer and the employee to do so. Because there is no evidence that Gotham Pizza notified its employees that it intended to offset paid meal breaks in computing employees' regular rate of pay, much less that the employee agreed to that offset, no subtraction for such meal breaks is permitted in calculating an employee's hourly rate of pay."

Id.

All of the same elements are present in this instant case. In his offer of employment letter, Plaintiff was told his lunch break would be paid, and he was never notified otherwise. Similarly, there are no records maintained as to when Plaintiff took a lunch or whether, if so, he was completely relieved from duty during that particular meal break.   Given the testimony, Plaintiff's lunch, much like that of the pizza deliverers in *Alonso*, can be described as a "catch-as-catch-can" meal break.   A "catch-as-catch-can" meal break is, by definition, not a regularly scheduled meal break.   Further, relying on Plaintiff's testimony that he sometimes took lunch, will in fact make the trial on this matter needlessly complex, or will waste judicial resources, since there are no time records to support or refute Plaintiff's broad recollection. Indeed, in this realm, Defendant

resorted to testimony about "what coulda been" and how Plaintiff should have been able to take a meal break.  However, this evidence is useless and not how the law works.  An employer's ability to demonstrate compliance with the FLSA relies on it's pay records, not "coulda-shoulda-wouldas."  Further, the testimony concerning what "coulda happen" during one of the lunches Plaintiff "may have taken" demonstrates Plaintiff was subject to being interrupted in the event he and his Big Red forklift were needed at certain place on the Mill.  (Doc.111-5 at 18) ("There would be a couple of days I'd get my plate and then have to run move a list for them."); Doc. 111-7 at 16) ("He knows when the coils is coming off which allows him to adjust his schedule to take breaks and take a lunch when he needs to."); (Doc. 84-3 at 1065) ("So there's times that he would get a full 30 minutes or even more if he needed to. And there would be some other times that he would be able to get 15 or 20 minutes, and then go back and get the rest of it.").

In sum, Defendant's after the fact attempt to characterize its meal break policy as providing a "bona fide meal break" is nothing more than a fiction, put together to evade Defendant's overtime pay obligations resulting from its non-neutral rounding policy. Accordingly, the Court GRANTS summary judgment as to Plaintiff's rounding claim.

### C.   The Workweek Violation

Both parties seek summary judgment as to the "workweek violation" claim.  (Docs. 91 and 100).  Plaintiff contends that Defendant did not designate and use a fixed, recurring 168-hour period to calculate overtime pay as required by the FLSA (Doc. 91 at 18-20) and Defendant contends it was indisputably using a 168-hour fixed workweek that did not deny Plaintiff overtime. (Doc. 100 at 21-23).

### 1.    The Undisputed Facts

The parties agree on several relevant facts.  First, there is no dispute that the Earning Statements and Payroll Summaries given to employees contained a Monday to Sunday pay period until January 27, 2019, and a Sunday to Saturday pay period after January 27, 2019.  (Doc. 85-2; Doc. 83-2; Doc. 89-1).  Second, Plaintiff's offer letter of employment states "[t]he pay-week starts at 6:00 am Sunday and ends at 5:59 am the following Sunday."  (Doc. 99-16 at 14).  Third, there is no dispute that all employees are paid on the same workweek. (Doc. 92; Doc. 85-2). Finally, while the parties dispute on which days Defendant's established workweek runs, the parties agree Defendant does not split shifts.  As explained by Plaintiff,

> Whether employees work shifts that run from 6:00 p.m. Saturday – 8:00 a.m. Sunday, or 7:00 p.m. Saturday – 7:00 a.m. Sunday, or 5:00 a.m. Sunday until 1:00 p.m., or 3:00 p.m. Sunday (or any other shift), OTK always counts all of the hours that the employee works on a shift together in determining whether OTK is going to consider the employee as having worked more than 40 hours. So, when an employee works from 7:00 p.m. Saturday – 7:00 a.m. Sunday, the time from Sunday 6:00 a.m. – Sunday 7:00 a.m. is not counted as part of a different week from the other 11 hours. And when an employee works 5:00 a.m. – 1:00 p.m. Sunday, the time from 5:00 a.m. – 6:00 a.m. is not counted as part of a different week than the other 7 hours.

(Doc. 91 at 19).

### 2.    Regulations Applicable to the "Workweek"

As this Court previously stated in *Hornady I*:

> Understanding the parameters of Defendant's "workweek" is also essential to determining "regular rate of pay" and Plaintiffs' overtime claims. Overtime required under the FLSA cannot be calculated without determining "workweek." *See  Tenn. C. v. Muscoda*, 321 U.S. 590, 597-598, 64 S.Ct. 698, 88 L.Ed. 949 (1944) ("It is vital, of course, to determine first the extent of the actual workweek. Only after this is done can the minimum wage and maximum hour requirements of the Act be effectively applied."). "Under the Fair Labor Standards Act, overtime is calculated on a workweek basis." *Jenkins v. Anton*, 922 F.3d 1257, 1269 (11th Cir. 2019) (citing 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.103). The FLSA

"maximum hours" provision (29 U.S.C. § 207(a)(1)) states "the unit of time ... within which to distinguish regular from overtime [work] is the week." *Abshire v. Redland Energy Servs.*, LLC, 695 F.3d 792, 794 (11th Cir. 2012) (citing Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 579, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)). "An employee's workweek is a fixed and regularly recurring period of ... seven consecutive 24-hour periods" that "need not coincide with the calendar week but may begin on any day and at any hour of the day." *Jenkins*, 922 F.3d at 1269 (citing 29 C.F.R. § 778.105). Once the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked. *Abshire*, LLC, 695 F.3d at 794 (citing 29 C.F.R. § 778.105).

*Hornady I*, 572 F. Supp. at *1180.

### 3.    Analysis

Plaintiff's position that summary judgment is warranted is two-fold.   First, Plaintiff contends that the undisputed factual evidence establishes that the "designated weeks for calculating pay begin at 12:00:01 a.m. Monday (and end at midnight Sunday) until January 27, 2019" and after January 27, 2019, began "at 12:00:01 a.m. Sunday and end at midnight Saturday." (Doc. 91. at 18). For support, Plaintiff relies on the Payroll Summaries and Earnings Statements and the testimony of Defendant's witnesses that after January 2019, those records were "correct" and that employees should be able to rely on them. *Id.*   Second, Plaintiff argues that because Defendant always counts all the hours that the employee works on a shift together in determining whether overtime exists, there can be no dispute that Defendant has not designated and used a fixed, recurring 168-hour period that begins/ends Sunday at 6.a.m. (*Id*. at 20).

In response, Defendant argues it pays wages based on a fixed, recurring pay period from 6 a.m. Sunday through second shift beginning 6 p.m. Saturday as evidenced by Plaintiff's offer

letter[9] and Defendant's handbook.  (Doc. 112 at 39).  It additionally argues that Plaintiff's reliance

on the payroll records is misplaced because there is simply no evidence that the payroll records

have any "effect on the actual calculations of employees' pay."  (*Id*. at 40).  For support,

Defendant points to the testimony of David Scheid who stated that payroll documents do not

affect compensation because they are not used to calculate wages and the testimony of Pledger,

who, among other things, provided that since 2015 the workweek began 6 a.m. Sunday and

would end the following Sunday at 6.am.  (Doc. 112 at 40).  Finally, Defendant contends that

"Gibson was not denied overtime pay by OTK's workweek practices."  (*Id*. at 42).  More

specifically, Defendant asserts that it is permitted under the FLSA to not "split-shifts" which

resulted in Plaintiff being paid more, not less, overtime than if it had split shifts.  (*Id*. at 42-43).

As such, Defendant argues that its payment for work through the end of the second shift Saturday

"can be viewed to act as a prepayment of the overtime for the following week"  (Doc. 112 at 43

citing to *Singer v. City of Waco, Tex.*, 324 F.3d 813, 828 (5th Cir. 2003) ("When the city overpaid

its employees in the 96-hour periods, it essentially compensated the employees for the shortfalls

in the 120-hour periods. . . . It seems more appropriate to view these overpayments as pre-

payments: the City pre-paid the fire fighters to compensate them for the shortfalls they would

receive in subsequent 120-hour work periods.").

With respect to OTK's non-shift-splitting position and its prepayment argument, Plaintiff

argues Defendant ignores, first, that employees have to be paid 1.5 times the regular rate of pay

---

[9] Of note, Gibson points out that OTK's reliance on any offer letter is disingenuous as there is no dispute that employee offer letters contain various designated workweeks while the testimony of OTK clearly establishes that employees are paid the same way.  As such, Plaintiff contends that OTK cannot rely on self-created documents which are facially lawful, but wholly inaccurate to support its argument.  *See* Doc. 91 at fn. 10.  However, there is no dispute Plaintiff's offer letter indicated "[t]he pay-week starts at 6:00am Sunday and ends at 5:59am the following Sunday".  (Doc. 99-2 at 24).

for all hours actually worked in the workweek, and second, that there must actually be a pre-payment. (Doc. 110 at 23).  Plaintiff then points to the testimony of Villacreces that no prepayments were made to support that Defendant's arguments are without merit.  (*Id*.)

Based on the record before this Court, a triable issue of fact exists as to whether Defendant calculated overtime wages pursuant to a fixed, recurring 168-hour period.  On the one hand, the relevant payroll records and the testimony of Defendant's witnesses regarding the reliability of the records, ostensibly support a Monday – Sunday, and then, later, a Sunday – Saturday workweek.  On the other, the offer letter, the handbook, and the testimony of Defendant's employees and representatives relating to the calculation aside from the payroll records, ostensibly support a Sunday-to-Sunday workweek.  Given the dispute of fact, summary judgment is not warranted.   Further, until the parameters of the workweek are established[10], this Court cannot determine whether Defendant's workweek practices resulted in an underpayment or whether, as Defendant contends, Plaintiff received all the overtime he was entitled to as a matter of law.

However, in an effort to address the all the issues raised by the parties, the Court will briefly address the parties' positions with respect to Defendant's non-shift-splitting practice and its ability to offset overtime compensation due in one week against amounts due in another as a "prepayment."  As outlined above, Defendant asserts that its workweek practices did not deny Plaintiff overtime compensation because Plaintiff was paid for work performed after Sunday at 6

---

[10] Notably, the FLSA Opinion Letter relied on by OTK for its non-shift splitting workweek, requires overtime of one and a half times the RROP for every hour worked over forty. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 2086806, at *2 (May 27, 2005). Indeed, OTKs argument notes the caveat "as long as an employee receives the overtime he is entitled to …". (Doc. 100 at 23 and Doc. 112 at 43). However, as addressed herein below, OTK did not properly calculate the RROP, such that the facts would indisputably establish that OTKs non-shift splitting complied with all the requirements set forth in the Opinion Letter.

a.m. as part of the Saturday night shift on only three occasions which cumulatively resulted in

Plaintiff being paid more overtime than he would have if Defendant had split shifts. (Docs. 100

and 112). For support, Defendant relies on a DOL opinion letter which states in relevant part, as

follows:

> Though compensation due an employee must normally be paid at the time of the
> employee's regular pay period, the Wage and Hour Division has no objection if an
> employer, such as your client, pays in advance the compensation that the
> employee will be due in a subsequent pay period by including all hours worked in
> a single shift in the workweek in which that shift began. However, employees must
> always be paid time and one-half their regular rate of pay for each hour actually
> worked over 40 hours in the workweek and the employer must not manipulate
> the schedule in order to avoid the overtime pay requirement of the FLSA.

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2005 WL 2086806, at *2 (May 27, 2005).

The Court appreciates Defendant's reliance on the first sentence of the above quoted language.

However, problematic for Defendant is the caveat set forth in the accompanying sentence that

"[h]owever, employees must always be paid time and one-half their regular rate of pay for each

hour actually worked over 40 hours in the workweek". *Id*. Unlike in the factual scenario on which

the letter was based and as set forth below, in this action there is also an overlapping violation

of the FLSA for Defendant's failure to calculate Plaintiff's regular rate of pay. As such, Defendant's

compliance with a portion of the DOL opinion letter on which it relies would not unequivocally

establish Defendant's non-shift-splitting practices were permitted such that summary judgment

should be granted in Defendant's favor.

Next, the Court is unpersuaded by Defendant's position that its pay practices as a result

of not shift-splitting can be viewed as a "prepayment." As an initial matter, Defendant has not

cited to any binding authority supporting its position. Next, the cases relied on by Defendant are

factually distinguishable in a number of ways. In *Singer v. City of Waco, Tex*., 324 F.3d 813, 828

(5th Cir. 2003), the Fifth Circuit allowed an *exception* for an employer to offset certain wage

overpayments against the employees' overall damages award.  In so doing, the court explained:

> However, we need not view the overpayments made by the City during the 96–
> hour work periods as "late" payments of overtime compensation. It seems more
> appropriate to view those overpayments as pre-payments: the City pre-paid the
> fire fighters to compensate them for the shortfalls they would receive in
> subsequent 120–hour work periods. Although § 778.106 states that overtime
> compensation "generally" should be paid in the same work period in which the
> work is performed, the provision does not prohibit an employer from paying
> overtime compensation in advance. Indeed, in cases such as the present one, in
> which the employees regularly work overtime, it seems logical that an employer
> would choose to pre-pay its employees for that regularly scheduled work. Thus,
> we hold that the district court did not err in offsetting the overpayments paid to
> the fire fighters in some work periods against the shortfalls in other work periods.

*Id*. at 828.  The relevant facts in *Singer*, established that fire fighters worked a regularly recurring

cycle which resulted in three fourteen-day periods.  The first two periods the fire fighters would

work 120 hours, and in the third, they would work 96 hours, but regardless of hours worked in

each period, they were paid a salary every two-weeks.[11]  The City divided the total annual salary

by hours worked to establish an hourly rate, then used the hourly rate to establish overtime pay.

*Id*. at 817.

The facts in *Singer* simply do not align with the facts in this action.  Rather, here, there are

no facts which establish that Plaintiff worked a set amount of overtime on a regular schedule,

which Defendant could precisely anticipate, or that Defendant consciously chose to pay Plaintiff

in advance.   Indeed, Defendant's representative testified no prepayments were made.  Instead,

here, Defendant argues that while it did not anticipate the amount of overtime Plaintiff would

---

[11] Of note, in *Singer,* Waco paid its firefighters under a special provision of the FLSA that permitted an employer to
choose a "work period" for firefighters ranging from 7 to 28 days in order to avoid the 40–hour week presumption
of the FLSA. 324 F.3d at 818, 819.

work on any given workweek, because its workweek practice resulted in payment of overtime early on a few occasions, Defendant should be allowed to claim an offset because its payment was effectively a prepayment.  The Court is unpersuaded. Further, Defendant's numerous overlapping FLSA violations are far removed from the scenario depicted in *Singer* such that factual distinctions aside, the legal rationale would generate a similar result in this action. Notably, in *Singer* (and *Banegas* discussed below), the Court and the parties were readily able to calculate the regular rate, the overtime compensation due, and the overtime wages not paid when considering the potential offset. To the contrary, in this action, it is clear that Defendant did not properly calculate Plaintiff's regular rate of pay, may or may not have designated a proper "workweek", and engaged in improper rounding practices.  As a result, it is unclear in this action if the alleged "prepayment" made to Plaintiff will be able to even be deemed an overpayment once the relevant calculations pertaining to the other overlapping violations are quantified. Accordingly, the Court is not convinced at this stage, on this record, that *Singer* compels that Defendant's payments of overtime in one workweek can offset its shortfalls in other workweeks.

Defendant's reliance on *Banegas v. One Two Tree, Inc.,* 2010 WL 3212067, *4 (S.D. Fla. Aug. 12, 2010), fares no better.  In *Banegas*, an employee sued its former employer for overtime compensation under the FLSA.  Although the court granted summary judgment because the employer was not subject to the FLSA, it nevertheless discussed the employer's affirmative defense of set-off based on the employer's position that no overtime compensation was due because it was entitled to an offset for a previous erroneous payment for holiday pay. (*Id*. at *4). The district court found that the case fell within the *Singer* exception because the overpayment resulted in the employee being paid his full overtime wages early, rather than late.  These facts

are not analogous to the facts in this action.  Again, here, the undisputed facts do not establish that the alleged pre-payments were, in fact, overpayments which could then be deemed pre-payments.  Accordingly, the Court is not convinced that the *Singer* exception warrants summary dismissal of Plaintiff's workweek violation claim.

### D.    The RROP Violation Claim

Plaintiff seeks summary judgment that Defendant willfully violated the FLSA by failing to correctly calculate the regular rate of pay for the purposes of paying overtime (the "RROP calculation violation claim").  According to Plaintiff, the undisputed facts establish:

1) that Defendant makes trued-up payments to fix prior underpayments[12];

2) that even using OTK's mis-designated workweek, when Plaintiff worked more than 40 hours in a week at night shift, the pay rate he received for overtime was about $.40 /hour less that the law requires;

3) that the RROP is calculated based on two "weeks" of time and pay, instead of a single week basis and that the pay Plaintiff should have received when he worked overtime in a week with night shift work was unlawfully reduced because OTK factored in day shift rates from different weeks, as well as holiday pay, vacation pay, etc. at lower rates;

4) that the RROP depends somewhat on whether Defendant designates hours worked over a two week period as "Regular" (day shift), "Shift Regular" (night shift), "Overtime" (associated with day shift) or "Shift Overtime" (associated with night shift).

(Doc. 91 at 20-21).   Moreover, Plaintiff asserts that because the undisputed facts establish that Defendant has violated the FLSA by improperly calculating the regular rate of pay, "[t]he issue of law for the Court is how this impacts damages. Plaintiff submits that the legal question can be answered based on Eleventh Circuit authority concerning FLSA record-keeping violations, or by

---

[12] Although combined in Plaintiff's arguments, the Court will address the true-up violation claim separately herein below.

treating these violations like other real-time spoliation." (Doc. 91 at 5). In this regard, Plaintiff

argues since Defendant failed to adequately keep records, it should be prevented from applying

"aggregated amounts it designated as overtime pay against what it owed Gibson for overtime in

specific weeks." (Doc. 91 at 25).

In response, Defendant does not address the grounds on which Plaintiff contends it

improperly calculated the RROP in violation of the FLSA. (Doc. 112 at 45-46, generally). Further,

in its own undisputed facts Defendant states "OTK has never hid the fact in this case that it was

using two-week calculations." (Doc. 112 at 15). Instead, Defendant makes three arguments (1)

Defendant can credit payments for one workweek against amounts due in another, (2) Plaintiff's

paid meal breaks will offset against any alleged unpaid overtime, and (3) Defendant properly

maintained records. (*Id.*)

This Court set forth the relevant law as to the RROP calculation in *Hornady* and its

importance as follows:

> Section 7(a)(1) of the FLSA requires that employers compensate their employees
> for hours worked in any workweek in excess of forty "at a rate not less than one
> and one-half times the regular rate at which [they are] employed." 29 U.S.C. §
> 207(a)(1). Overtime compensation, therefore, depends on an employee's "regular
> rate" of pay and the employee's work schedule in relation to the employer-
> determined "workweek." In order to determine whether overtime has been paid
> correctly, the analysis commences with the identification of the employee-
> plaintiff's "regular rate of pay." An employee-plaintiff's "regular rate" of pay is the
> "keystone" of Section 7(a) claims. *Walling v. Youngerman-Reynolds Hardwood Co.*,
> 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945); *Childress v. Grady Mem.
> Hosp. Cop.*, 2016 WL 9651268 at *24–25, 2016 U.S. Dist. LEXIS 199051, *77–79
> (N.D. Ga. May 12, 2016)–; *see also Urnikis-Negro v. Am. Family Property Servs.*,
> 616 F.3d 665, 673 (7th Cir. 2010) ("The employee's 'regular rate' of pay is thus the
> 'keystone' of section 7(a).") (quoting *Walling*, 325 U.S. at 424, 65 S.Ct. 1242). In
> *Walling*, the Supreme Court declared "the amount of overtime payments which
> are necessary to effectuate the statutory purposes" depends on the "regular
> rate," and "[t]he proper determination of that rate is therefore of prime
> importance." 325 U.S. at 424, 65 S.Ct. 1242.

> The "regular rate" of pay is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Boyle v. City of Pell City*, 866 F.3d 1280, 1286 (11th Cir. 2017) (citing *Walling*, 325 U.S. at 424, 65 S.Ct. 1242). "The 'regular rate' of pay under the Act is the amount of compensation an employee receives per hour." *Martin v. Southern Premier Contrs., Inc.*, 2013 WL 822635, at *9, 2013 U.S. Dist. LEXIS 30017, *26 (N.D. Ga. March 6, 2013) (citing 29 C.F.R. § 778.109 ("The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.")). "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." *Id*. (citing *Walling*, 325 U.S. at 424, 65 S.Ct. 1242).

*Hornady I*, 572 F. Supp. at 1179.  Although both parties expend multiple pages of their motions and briefs sparring over various facts and issues relating to the RROP, one thing is abundantly clear: after *years* of litigation, Defendant has now admitted that it calculates the RROP over a two-week period.  Not only does such an acknowledgement confirm the necessity of this Court's previous determination in *Hornady*, but it unequivocally establishes that Defendant's calculation of the RROP directly violates the FLSA.  Accordingly, summary judgment is warranted in favor of Plaintiff.

Liability aside, the Court will discuss the Defendant's arguments with respect to the ramifications of its failure to properly calculate Plaintiff's RROP, which this Court understands to be that Defendant is entitled to a credit for any underpayments on three separate grounds.  First, Defendant's position that it can credit payments for one workweek against amounts due in another directs the Court back to its arguments with respect to its workweek practices (above) based on *Singer* and *Banegas*, without any added argument.  The Court has already addressed

those arguments above and need not do so again.[13]  Second, Defendant's position that paid meal breaks offset Plaintiff's unpaid overtime is unconvincing for all the reasons set forth hereinabove at Section 3d.  Third, Defendant's position that it kept "such records that anyone – the employer, the employee, or the Department of Labor – upon inspection can compare an established pay period with a corresponding work period that permits ready calculation of the wages per hour" is equally unconvincing.  (*See* Doc. 112 at 45-46 citing to *Olson v. Superior Pontiac*, 776 F. 2d 265, 266 (11th Cir. 1985).  Although Defendant indicates that it "kept" such records, for support it states that it has "produced a formula created by Villacresces" to demonstrate the RROP would have been.  Considered alone, the need to "create" an *ex post facto* formula plainly contradicts that records were kept in a manner that anyone could calculate the RROP.  Thus, to the extent that Defendant contends these arguments, individually or combined, defeat summary judgment, they do not.[14]

### E.    True Up Violation

The parties both seek summary judgment as to whether Defendant willfully violated the FLSA by failing to correctly pay overtime on the regular payment date or to timely pay overtime, in

---

[13] The Court notes that Defendant's prepayment argument appeared to be limited to a credit for the three occasions in which Plaintiff was paid overtime for worked performed after 6 a.m. Sunday, because said work was performed as part of the second shift on Saturday evening.  Because questions of fact remained as to the parameters of the workweek, a ruling on whether Plaintiff received all the overtime compensation to which he was entitled was not warranted.  Here, however, Defendant refers the Court to its previous stance in response to Plaintiff's position as to the RROP calculation violation, apparently for the position that it should be allowed to obtain a credit for unidentified aggregated amounts it designated as overtime pay.  Defendant's argument is less convincing in this context.

[14] Of note, neither Plaintiff nor Defendant sought summary judgment as to any alleged record keeping violation claim.  Additionally, while Plaintiff offers two potential avenues for the Court to travel with respect to damages, Plaintiff has not sought summary judgment as to damages (that this Court can tell). As such, this Court's comment on the uncompelling nature of Defendant's record keeping position is limited to the context in which Defendant's argument was raised and is not a determination that Defendant is not entitled to *any* credit/offset as a matter of law.

violation of 29 U.S.C. § 206(b) and 29 CFR § 778.106 (the "true up violation claim"). (Doc. 91 and Doc. 100).

According to Plaintiff, the only record evidence in this action is the testimony of Pledger in March 2020 in the *Hornady* action, that OTK makes trued-up payments to fix prior underpayments. (Doc. 91 at 20). As such, Plaintiff asserts that he is entitled to summary judgment and to liquidated damages. (Doc. 117 at 25-26). Contrarily, Defendant argues that the undisputed record establishes that it does not make trued-up payments warranting summary dismissal of Plaintiff's claim. For support, Defendant points out that since 2020, Pledger has corrected her previous deposition testimony to clarify that "true-up" is the same thing as RROP. (Doc. 112 at 44). It additionally points to the testimony of ADP's corporate deponent in this action who testified that "true-up" is not a term of art and that were no payments made in subsequent pay periods for prior pay periods as pay is calculated by the ADP system. (Doc. 112 at 44). As such, Defendant contends Plaintiff's request should be denied and, instead summary judgment should be granted in its favor. In reply, Plaintiff argues that Defendant's "corrected" testimony either fails to "correct" Pledger's testimony or is inadmissible (Doc. 110 at 24-25), and Defendant argues the opposite (Doc. 118 at 19-21).

29 CFR § 778.106 states in relevant part, as follows:

> There is no requirement in the Act that overtime compensation be paid weekly. The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

On the record before this Court, summary judgment is not warranted.  In *Hornady*, Pledger testified that Defendant makes trued-up payments to fix prior underpayments.  (Doc. 99-8 at 3). After her deposition in *Hornady*, Pledger submitted a declaration which stated in pertinent part: "At the time of my deposition, it was my […] understanding […] that ADP utilized a "true-up" process whereby ADP's software made adjustments to a given pay period […]. I am now advised and understand this testimony was inaccurate.  It is now my understanding that ADP does not use a true-up process [...]".  (Doc. 99-13 at 6-7).  In 2022, Pledger testified in this action.  Pledger was asked about her use of the phrase "true up payment" in an email to ADP, and Pledger's response stated, in pertinent part "[t]he true up is exactly the same thing as the RROP.  They just used the 'true up' term to begin when they were first describing it to me […]".  (Doc. 99-7 at 6). Also, in this action, Robin Raines, an employee of ADP testified that she was unfamiliar with the term "true up" in relation to Workforce Now and was unaware of any automatic calculations/payments that were made if there were hypothetical underpayments due to improperly calculating the RROP.  (Doc. 99-12 at 4-5).  Next, in this action Defendant appointed Villacreces as its 30(b)(6) representative instead of Pledger to testify as to the issue of RROP and the testimony of Pledger in 2020.  Villacreces testified that his knowledge on the subject of Pledger's previous testimony was based solely on reading that testimony, that he had no reason to believe that testimony was false, and that although it could be inaccurate, he had not talked to Pledger or ADP to determine whether the testimony was inaccurate.  (Doc. 86-3 at 57-62). Finally, Villacreces has submitted a declaration in this action which states in relevant part "[a]t no time did OTK have a practice of recalculating overtime pay due in subsequent pay periods. My review of Gibson's time and pay records demonstrates that OTK did not have a practice of

"truing up" overtime payments in subsequent workweeks or recalculating the overtime payments for underpayments in previous workweeks […]." (Doc. 99-16 at 10).

Potential admissibility issues aside, the testimony of Pledger from 2020 and 2022 when considered in conjunction with the testimony of Villacreces in this action, creates a question of fact for a jury. As such, summary judgment as to the true up violation is not warranted.

### F.    Common Law Claims

Both parties seek summary judgment as to Plaintiff's common law claims of *quantum meruit* and unjust enrichment. (Doc. 91 and Doc. 100). According to Plaintiff, "OTK knew that Gibson was performing work activities within the periods it rounded down and did not pay him" and as a result Plaintiff is entitled to judgment as a matter of law. (Doc. 91 at 25-26). On the other hand, Defendant argues that Plaintiff's state law claims fail as a matter of law because (1) Plaintiff's *quantum meruit* claim is subject to a three year statute of limitation, (2) Plaintiffs' state law claims for hours worked in excess of forty hours in a workweek are pre-empted by the FLSA, and (3) Plaintiff has failed to establish state law claims for hours worked fewer than forty hours in a workweek because he cannot establish that he expected to be paid for such time and because he cannot establish that Defendant's pay practice was unjust. (Doc. 100 at 10-17). Alternatively, Defendant argues that summary judgment is not warranted because a question of fact exists as to "whether Gibson had a reasonable expectation that he would be paid for all time worked while clocked in and whether Gibson performed work for the benefit of OTK during all the time he was clocked in." (Doc. 112 at 46).

### 1.    *Quantum Meruit*/ Statute of Limitations

Defendant contends Plaintiff's claim for *quantum meruit* fails as a matter of law to the

extent Plaintiff seeks the value of allegedly unpaid wages more than three years before he filed

his Complaint in the action pursuant to Ala. Code § 6-2-37. (Doc. 100 at 10-11). In response,

Plaintiff asserts that even if the three-year statute of limitations set forth in Ala. Code § 6-2-37

applies, it has no effect on Plaintiff's claim because the statute would not begin to run until

Plaintiff was terminated, which was just before the instant action was filed. (Doc. 110 at 12).

Defendant did not address Plaintiff's argument in its reply.  (Doc. 118, generally).

> Under Alabama law, a *quantum meruit* claim for the reasonable value of services
> rendered "is merely an open account", and is subject to the three-year statute of
> limitations of Ala. Code § 6–2–37. *See White v. Sikes, Kelly, Edwards and Bryant,
> P. C.*, 410 So.2d 66, 69 (Ala. Civ. App. 1982) (citations omitted). Under § 6–2–37,
> the three-year time period begins to run "from the date of the last item of the
> account or from the time when, by contract or usage, the account is due." ALA.
> CODE § 6–2–37(1).

*Rolison v. Sterling*, 2009 WL 2514294, at *12 (S.D. Ala. Aug. 13, 2009). There is no dispute that

Defendant's rounding practices were in effect the entirety of Plaintiff's employment with

Defendant and no dispute that Plaintiff's employment ended in 2018.  Likewise, the record

establishes that Plaintiff was terminated in February 2021 and this action was filed in March

2021. (Doc. 92 at 3).  Accordingly, the undisputed facts establish that, assuming Plaintiff's claim

are subject to the limitations period set forth in Ala. Code § 6–2–37, they are not time-barred.

As such, summary judgment in favor of Defendant on this ground is not warranted.

### 2.    Pre-Emption

Defendant next argues that "to the extent Plaintiff's *quantum meruit* and unjust

enrichment claims are premised on his allegation that he is entitled to unpaid wages for hours

worked in excess of forty hours in a workweek beyond the three-year FLSA statute of limitations,

his claim must fail" because his claim is pre-empted by the FLSA.  (Doc. 100 at 11-13).  In response,

Plaintiff argues that the FLSA does not provide a remedy to recover the value of the services he performed in weeks in which he worked less than 40 hours ("pure gap time") or beyond the statute of limitations.  (Doc. 110 at 7-9).   For support, Defendant points to a number of cases within and outside of Alabama federal Courts for the proposition that the FLSA provides the exclusive remedy for state law claims that are duplicative of FLSA.  (*See* Doc. 100 at 11-13).    In reply, Defendant maintains that Plaintiff's gap time claims and straight time pay for hours beyond the three-year limitations period are preempted because they rely on the FLSA for relief.  (Doc. 118 at fn. 1).

Section 216 of the FLSA is the exclusive remedy for enforcing rights created under the Act. *See Tombrello v. USX Corp.,* 763 F. Supp. 541, 545 (N.D.Ala.1991). "As a matter of law, [a] plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state law claims in addition to [a] FLSA claim." *Id.*  A review of the cases relied on by Defendant clearly establish that the FLSA provides the exclusive remedy for state law claims that are duplicative of FLSA.  However, they do not support Defendant's position with respect to claims, like those in this action, that fall outside the scope of FLSA.  Indeed, Plaintiff agrees that his common law claims do not seek minimum wage payments for what the FLSA considers compensable time or payment of "overtime" at an increased rate.  (Doc. 110 at 8).

With respect to Plaintiff's pure gap time claims, this Court has previously determined:

This Court joins other district courts in this Circuit in following the majority position that gap-time claims are not cognizable under the FLSA. For Plaintiffs to recover wages for uncompensated time worked in weeks where the hours worked was less than forty hours, their claims must proceed under Alabama common law. *See Jernigan v. 1st Stop Recovery, Inc.,* 2017 U.S. Dist. LEXIS 136499 at *5 (M.D. Fla. August 25, 2017) ("Because there is otherwise no adequate remedy at law under the FLSA for a ['gap time'] claim, equitable relief may be pursued.") (*citing Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.,* 14 F.3d 1507, 1518 (11th Cir.

1994)); *see also Carter v. Jackson-Madison County Hosp. Dist.*, 2011 U.S. Dist. LEXIS 35163 at *25 (W.D. Tenn. March 31, 2011) (allowing plaintiff's unjust enrichment claim to move forward at the pleading stage where she seeks to recover compensation for meal periods during weeks where she worked less than forty hours).

*Hornady II* at *13. While Defendant seems to maintain that Plaintiff's state law claims are preempted in its reply, it makes no effort to address Plaintiff's response that Plaintiff's state law claims do not depend on any violation of the FLSA or address this Court's prior determination on the issue of pure gap time. As such, to the extent Defendant seeks summary dismissal of Plaintiff's state law claims for wages for hours worked in excess of forty hours in a workweek beyond the three-year FLSA statute of limitations or pure gap time claims because they are preempted by the FLSA, summary judgment is not warranted.

### 3. *Quantum Meruit*

Both parties seek summary judgment as to Plaintiff's common law claims.[15] (Doc. 91 and Doc. 100). Plaintiff's position is very simple, "OTK knew that Gibson was performing work activities within the periods it rounded down and did not pay him." (Doc. 91 at 25-26). As such, Plaintiff contends he is entitled to summary judgment. (*Id*). In response and in its own motion, Defendant argues that Plaintiff's state law *quantum meruit* claim fails because the Amended Complaint and record establish that Plaintiff had no expectation of being paid for all the time worked while clocked in during weeks that he worked fewer than forty hours.[16] (Doc. 100 at 13-15; Doc. 112 at 46-47). Defendant's position is based, in large part, on Plaintiff's testimony

---

[15] Plaintiff's argument is one paragraph and makes no distinction between his common law theories of recovery. However, this Court will address each theory separately.

[16] Defendant did not separately address Plaintiff's contention that he is entitled to recover the unpaid value of his services during all weeks before the three-year FLSA recovery period.

relating to his understanding of Defendant's rounding policy and knowledge of the policy per the employee handbook. *Id*. For support, Defendant points to *Iraola & CIA., S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1282 (11th Cir. 2003) and a series of cases, including *Carroll v. LJC Def. Contracting*, *Inc.*, 24 So. 3d 448 (Ala. Civ. App. 2009) (relied on by Plaintiff) which it contends supports summary judgment in its favor. (Doc. 100 at 14; Doc. 112 at 46-49). Finally, Defendant asserts that Plaintiff cannot present any facts that his compensation was inadequate given his testimony that he was "tickled pink" with his compensation. (Doc. 112 at 48-49). In response, Plaintiff argues that cases relied on by Defendant are factually distinguishable and/or inapplicable (Doc. 110 at 12-13) and that Defendant cannot benefit from inaccurate expectations that it created, *i.e*, inaccurately explaining why it was rounding time down and not paying. (Doc. 117 at 30-31). In reply, Defendant argues that Plaintiff failed to distinguish the cases relied on by it and again points to Plaintiff's knowledge of Defendant's rounding policy and pay practice. (Doc. 118 at 11-12).

> A claim of quantum meruit, or quasi-contract, is a request for equitable relief based on the principle " 'that if one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one who so accepts with knowledge, to pay the reasonable value of such services rendered.' " *Frank Crain Auctioneers, Inc. v. Delchamps*, 797 So.2d 470, 474 (Ala.Civ.App.2000) (quoting *Richards* v. Williams, 231 Ala. 450, 453, 165 So. 820, 823 (1936)).

> > " 'In order to succeed on a claim based on a theory of quantum meruit, the plaintiff must show that it had a reasonable expectation of compensation for its services. *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So.2d 1345 (Ala.1991) [citing *Mahoney v. Loma Alta. Prop. Owners Ass'n*., 4 So.3d 1130, 1135 (Ala. Civ. App. 2008) (quoting *Mantiply v. Mantiply*, 951 So.2d 638, 656 (Ala. 2006).]

*Carroll*, 24 So.3d at 458-59.

> In this action, there is no dispute as to the first two elements of a *quantum meruit* claim.

Rather, the undisputed facts establish that Plaintiff provided services to Defendant, for Defendant's benefit, and Defendant did not pay Plaintiff for those services. The record also establishes that Plaintiff was compensated for his compensable work. Finally, it is undisputed that Defendant had a rounding policy of which Plaintiff knew, that automatically rounded down time prior to or after a shift start/end time.

The Court is not persuaded that summary judgment is appropriate. First, the Court is not convinced that *Iraola & CIA.,S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1282 (11th Cir. 2003), relied on by Defendant compels summary judgment on the instant record.[17] In *Iraola*, the Eleventh Circuit, citing Georgia law, determined that Iraola did not have a reasonable expectation of compensation to support its *quantum meruit* claim based on the facts which established that Iraola was to be paid by a third party. The relevant Georgia law stated, in part, "There can be no recovery for services rendered voluntarily and with no expectation at the time of the rendition that they will be compensated." *Iraola* at 1288 quoting *Broughton v. Johnson*, 247 Ga.App. 819, 820–21, 545 S.E.2d 370 (2001); *Pembroke Steel*, 138 Ga.App. at 745, 227 S.E.2d 491. (external quotes omitted). Georgia law aside, the facts in this action are distinguishable from *Iraola*. First, in this action, there are no facts that Plaintiff's services were "rendered voluntarily." To the contrary, Plaintiff was informed that failure to adhere to Defendant's policies relating to clocking in/out could result in disciplinary action. Second, there are no facts that Plaintiff would be paid by a third party. And last, the facts here establish that Defendant explained its rounding policy

---

[17] The Court also finds this action factually distinguishable from *Newsome v. Carolina Serv., Inc.*, 2012 WL 4320809, at *8 (N.D. Miss. September 18, 2012) relied on by Defendant because it "up[held] its end of the deal" as in *Newsome*, it was clear that the parties agreed to a specific form of compensation – a "banana box" and Newsome did, in fact receive the boxes whereas here, Plaintiff was not compensated at all.

as not compensating for travel time because it was not compensable, then accepted the benefit of Plaintiff performing services that were not travel time. (*See* Doc. 87-3 at 21) ("To accommodate travel time to and from these work areas (walking to the work area is unpaid time) time clocks are programmed to round in the following ways [...]"). As such, Plaintiff's knowledge of a policy that rounds down so as not to permit payment for non-compensable work, does not unequivocally establish as a matter of law that Plaintiff had no expectation of being compensated for compensable work. To the contrary, a reasonable juror could find based on these facts Gibson's belief that he would be compensated for time which was compensable to be reasonable. Because a question of material fact exists, summary judgment based on whether Plaintiff's expectation was "reasonable" is inappropriate.

Although summary judgment is not warranted, the Court will briefly address Defendant's secondary position, *i.e.*, that Plaintiff has not established his compensation was unreasonable or inadequate pursuant to *Carroll*. In *Carroll* (relied on by both parties), the plaintiff argued that he was entitled to compensation for services he performed on roof projects that were not included in his profit-sharing agreement. In addressing Plaintiff's *quantum meruit* claim, the Court stated that Plaintiff's "argument is answered by the fact that Carroll received a salary during the entire time that he worked on the blue-roof projects, and, on the blue-roof project for which he was the project manager, he received a double salary and a $25,000 management fee." *Id.* at 459. The Court also determined that "Carroll bore the burden of proving the reasonable value of the services he rendered." *Id.* (citing to *Utah Foam Prods., Inc. v. Polytec, Inc.,* 584 So.2d 1345, 1351 (Ala.1991)).

According to Defendant, *Carroll* supports its position that Gibson has failed to establish his compensation was unreasonable or inadequate based on his testimony that he was "tickled pink." (Doc. 112 at 48). Defendant's reliance on *Carroll* for this point is misplaced. In *Carroll*, the plaintiff was compensated for his services and failed to present evidence that his compensation was inadequate. Contrarily, in this action, it is undisputed that Gibson was not paid any compensation for the services he provided during the times that Defendant rounded down. As such, Plaintiff's testimony that he was "tinkled pink" over the compensation he received for work for which he was paid does nothing to establish he was likewise "tickled pink" for services for which he was not paid.

### 4.    Unjust Enrichment

Defendant also argues that Gibson's claim for unjust enrichment fails as a matter of law because he cannot establish that Defendant's practice was unjust. (Doc. 100 at 15-17). To that end, Defendant posits that from 2016-2020 Gibson's average gross salary was $79,439.39 per year, which in and of itself defeats any argument that Gibson was not reasonably compensated. (Doc. 100 at 16). For support, Defendant relies on *Middleton v. Int'l Bus. Machines Corp.*, 787 F. App'x 619, 623–24 (11th Cir. 2019) (affirming the dismissal of plaintiff's *quantum meruit* and unjust enrichment claims and holding plaintiff "cannot show that [he] was not already reasonably compensated for his services" when he could not show that his wages were "so unreasonably low that he is entitled to a recovery."). *Id.* Additionally, as discussed above, Defendant again argues that the parties did not agree to payment for all time clocked in and that Plaintiff was fully aware of Defendant's pay practice. (*Id.* at 17). Accordingly, Defendant contends that there is no evidence that Plaintiff acted "under a mistake of fact or in reliance on a right or duty.'" (*Id.*)

"'The doctrine of unjust enrichment is an old equitable remedy permitting the court inequity and good conscience to disallow one to be unjustly enriched at the expense of another.'" *Pentagon Fed. Credit Union v. McMahan*, 2021 Ala. LEXIS 60 at *8-9 (Ala. June 25, 2021) (*quoting Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003) (internal citations omitted). "Whether it applies in any given case 'depends on the particular facts and circumstances' of that case." *Id*. (*quoting Mantiply v. Mantiply*, 951 So. 2d 638, 655 (Ala. 2006)). In order to prevail on a claim of unjust enrichment under Alabama common law, "'a plaintiff must show that (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation.'" *Jones v. Scott Davis Chip Mill*, 2017 U.S. Dist. LEXIS 183106 at *58-59 (N.D. Ala. November 6, 2017) (*quoting Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008)).

Next, plaintiff must show retention of the benefit would be unjust. "'One is unjustly enriched if his retention of a benefit would be unjust.'" *Matador Holdings, Inc. v. HoPo Realty Invs., L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011) (quoting *Jordan v. Mitchell*, 705 So. 2d 453, 458 (Ala. Civ. App. 1997) (citing Restatement of Restitution: Quasi Contracts and Constructive Trusts, § 1, Comment (1937)). "Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Jones*, 2017 U.S. Dist. LEXIS 183106 at *58-59 (finding "In the absence of mistake or misreliance by the donor, or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched.") (citing Jordan, 705 So. 2d at 458 (internal citations omitted)).

*Hornady II*, at *13.

For the reasons stated above, the Court is not persuaded summary judgment is warranted based on Defendant's arguments that Plaintiff had no reasonable expectation of compensation or that he failed to establish his compensation was unreasonable or inadequate. With respect to Defendant's final argument, that Plaintiff cannot establish that Defendant's practice was unjust, the Court is similarly unconvinced. Given (1) Defendant's representation to its employees that its policy was in effect so as to not compensate for travel time, (2) that Defendant's employees were subject to disciplinary action for any non-compliance with its policy, and (3) Defendant's

expectation that its employees make relief (*i.e.* do something other than travel), the Court finds disputed facts exist as to whether the enrichment of Defendant was unjust.

> **G.    Affirmative Defenses**

Plaintiff additionally asserts that none of Defendant's affirmative defenses require adjudication by the trier of fact.  (Doc. 91 at 26-30).  To the extent that Defendant's Affirmative defenses overlap with the parties' cross motions for summary judgment, Plaintiff's request for summary adjudication of Defendant's defenses is DENIED IN PART and GRANTED IN PART as stated hereinabove.

**IV.    CONCLUSION**

After consideration of the relevant motions, briefs, and supporting evidence and for the reasons discussed, the motions are DENIED IN PART and GRANTED IN PART as stated hereinabove.

> **DONE and ORDERED** this 22nd day of March, 2023.

> /s/ JEFFREY U. BEAVERSTOCK
> CHIEF UNITED STATES DISTRICT JUDGE